UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| R-HOTEL, LLC, DONALD J. RISK, AMY L. RINEER, STEVEN P. RISK AND KIMBELL M. RISK<br><br>*PLAINTIFFS,*<br><br>v.<br><br>SHANER HOTEL GROUP LIMITED PARTNERSHIP, SHANER HOTEL HOLDINGS LIMITED PARTNERSHIP, OWEN INVESTORS LLC, SHANER SILVER MANAGER LLC AND LANCE T. SHANER, INDIVIDUALLY AND AS TRUSTEE OF THE LANCE T. SHANER REVOCABLE TRUST U/A/D DECEMBER 5, 2012<br><br>*DEFENDANTS.* | CIVIL ACTION<br><br>CASE NO. _____ |

## COMPLAINT

Plaintiffs R-Hotel, LLC ("R-Hotel"), Donald J. Risk, Amy L. Rineer, Steven P. Risk and Kimbell M. Risk (collectively, "Plaintiffs"), by and through undersigned counsel, Silverang, Rosenzweig & Haltzman, LLC, respectfully submit the instant Complaint and, in support thereof, aver as below:

### Introduction

1.  This case involves the development, financing and construction of a hotel in Silver Spring Township, Pennsylvania (the "Hotel Project") by Defendant Shaner Hotel Group Limited Partnership ("Shaner Hotel Group").

2.  In or about 2018, in contemplation of the Hotel Project, Shaner Hotel Group created an investment vehicle, Shaner Silver Spring Hotel, LLC (the "Company").

3.  The resulting hotel, the Fairfield Inn & Suites Harrisburg West/Mechanicsburg (the "Hotel") is located at 503 Winding Creek Blvd, Mechanicsburg, PA 17050 near Interstate 81, and opened in November 2020.

1

4.    The Hotel is a 107-room property managed by Defendant Shaner Hotel Holdings Limited Partnership (the "Hotel Manager").

5.    Shaner Hotel Group sought an investment partner in the Hotel Project, and marketed the investment to Plaintiffs through written and oral representations and promises regarding the expected returns from an investment in the Hotel Project, and award of the construction contract for the Hotel to Plaintiffs' construction company.

6.    Plaintiff R-Hotel was formed, and it purchased a fifty percent membership interest in the Company based on intentionally false, misleading and incomplete information supplied by Shaner Hotel Group, resulting in damage to Plaintiffs.

7.    Management of the Hotel by the Hotel Manager, participation in the investment by the Company's other investor Owen Investors LLC (the "Shaner Member")[1] and administration of the investment by Defendant Shaner Silver Manager LLC (the "Investment Manager"), have been riddled with irregularities, secrecy, deceit and outright fraud.

8.    These Defendants' actions, at the direction and under the control of Defendant Lance T. Shaner, are specifically disallowed under the Company's governing documents and the Hotel's management contract.

9.    Defendants have been enriched by their bad faith and self-dealing, and Plaintiffs have been damaged thereby.

---

[1] The Company is a partnership between Defendant Shaner Hotel Group and Plaintiff R-Hotel. The Company is a Delaware limited liability company established in Pennsylvania on September 17, 2018 and assigned Pennsylvania entity number 6772037. The Company's principal Pennsylvania address is 1965 Waddle Road, State College, PA, and its Governor is Defendant Lance T. Shaner.

## The Parties

10.    Plaintiff R-Hotel is an active Pennsylvania limited liability company established on June 13, 2018 and assigned entity number 6729954. Plaintiff's principal address is 11 West State Street, Quarryville, PA, and its Governor is Plaintiff Donald J. Risk ("DJ Risk").

11.    The members of R-Hotel are Plaintiffs DJ Risk, Amy L. Rineer, Steven P. Risk ("Steve Risk") and Kimbell M. Risk ("Kim Risk").

12.    Plaintiff DJ Risk is an adult individual and resident of the Commonwealth of Pennsylvania, with a business address at 11 West State Street, Quarryville, Pennsylvania. DJ Risk is the President of non-party Paul Risk Associates, Inc., a Pennsylvania corporation established in 1973. Paul Risk Associates, Inc. is a fourth-generation, 90-year-old family run design-build and construction management company headquartered in Quarryville, Pennsylvania that develops large scale projects in the commercial, industrial, educational, religious, cultural, multi-family, recreational, senior living and healthcare spaces.

13.    Plaintiff Steve Risk is an adult individual and resident of the Commonwealth of Pennsylvania, with an address of 217 Greystone Lane, Quarryville, Pennsylvania 17566. Steve Risk is the past President and current Governor of non-party Paul Risk Associates, Inc.

14.    Plaintiff Amy L. Rineer is an adult individual and resident of the Commonwealth of Pennsylvania, with an address of 530 Long Rife Road, Lancaster, Pennsylvania 17062.

15.    Plaintiff Kim Risk is an adult individual and resident of the Commonwealth of Pennsylvania, with an address of 217 Greystone Lane Quarryville, Pennsylvania 17566.

16.    Defendants are part of the Shaner hospitality management conglomerate established in 1979 by Lance and Fred Shaner, providing hotel acquisition, development, brand management

3

and facilities management as well as restaurants and "prestige collection" experiences in the United States, Italy, Greece and the Bahamas through its 4200 employees.[2]

17.     Defendant Shaner Hotel Group is a Delaware limited partnership established on December 6, 1995 and assigned Delaware file number 2568523. It was registered in Pennsylvania as a foreign limited partnership on December 18, 1995 and assigned entity number 2669272. Defendant Shaner Hotel Group's principal Pennsylvania address is 1965 Waddle Road, State College, PA, and its Governor is non-party Shaner Operating Corp.

18.     Defendant Hotel Manager is a Delaware limited partnership established on November 30, 2007 and assigned Delaware file number 4465603. It was registered in Pennsylvania as a foreign limited partnership on March 7, 2008 and assigned Pennsylvania entity number 3794747. Defendant Hotel Manager's principal Pennsylvania address is 1965 Waddle Road, State College, PA, and its Governor is non-party Shaner Hotel Holdings, Inc. Defendant Shaner Hotel Group owns a majority 79.7814 percent interest in the Hotel Manager, and Defendant Lance T. Shaner is the President of the Hotel Manager.

19.     Defendant Shaner Member is a Delaware limited liability company established on March 4, 2016 and assigned Delaware file number 5980218. It was registered in Pennsylvania as a foreign limited liability company on December 19, 2018 and assigned Pennsylvania entity number 6811671. Defendant Shaner Member's principal Pennsylvania address is 1965 Waddle Road, State College, PA, and its Governors are Owen and Kenneth Mayville.

20.     Upon information and belief, Kenneth Mayville is Defendant Lance T. Shaner's son-in-law. He is employed by the Shaner conglomerate as a financial analyst and/or for "special

---

[2] www.shanercorp.com.

projects."[3] Upon information and belief, Owen Mayville is Defendant Lance T. Shaner's grandson and Kenneth Mayville's son, and is a current high school student. Further upon information and belief, Defendant Shaner Member was established by Defendant Lance T. Shaner for the benefit of Owen Mayville.

21.     Defendant Investment Manager is a Delaware limited liability company established on September 13, 2018 and assigned Delaware file number 7055728. It was registered in Pennsylvania as a foreign limited liability company on September 17, 2018 and assigned entity number 6772003. Defendant Investment Manager's principal Pennsylvania address is 1965 Waddle Road, State College, PA, and its Governor is Defendant Lance T. Shaner. Its member is The Lance T. Shaner Revocable Trust ("Shaner Trust") u/a/d December 5, 2012.

22.     Defendant Lance T. Shaner is an adult individual and the Chairman and Chief Operating Officer of Shaner Operating Corp. (which is the Governor of Defendant Shaner Hotel Group), the Trustee of The Lance T. Shaner Revocable Trust ("Shaner Trust") u/a/d December 5, 2012. (which Shaner Trust is the Member of Defendant Investment Manager), and the President of Defendant Hotel Manager. Upon information and belief, Mr. Shaner also controls Defendant Shaner Member for the benefit of his grandson, Owen Mayville. Mr. Shaner has an address of 1241 Royal Palm Way, Boca Raton, FL 33432-7547.

### Jurisdiction and Venue

23.     This Court has jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331-1332(a)(1), insofar as the case raises one or more federal questions, the matter in controversy is between citizens of different states, and the matter in controversy exceeds the sum or value of

---

[3] LinkedIn profiles for Kenneth Mayville, visited December 7, 2025. Defendant Shaner Member is also registered as a Florida foreign limited partnership, with a current principal place of business and mailing address of 1965 Waddle Road, State College, PA, and assigned FEI number 08-1964129.

$75,000. *See also Arbaugh v. Y & H Corp.,* 546 U.S. 500, 513, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

24.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2), insofar as a substantial part of property that is the subject of the action is situated in Mechanicsburg, Cumberland County, Pennsylvania, which is within this district.

### Statement of Facts

*Shaner Hotel Group Pitches Plaintiffs to Construct and Invest in the Hotel*

25.    In late 2017, Chris White of Blackford Development Group[4] approached DJ Risk and indicated that Defendant Shaner Hotel Group was looking for a landowner or construction company to partner in the development of a hotel, and wanted to engage in a 50-50 partnership with that landowner or construction company to develop the hotel.

26.    The developer asked DJ Risk if Paul Risk Associates, Inc. might be interested in discussing the construction and investment opportunity with representatives of Defendant Shaner Hotel Group.

27.    DJ Risk indicated his interest in learning more about the construction and investment opportunity with representatives of Defendant Shaner Hotel Group.

28.    On January 10, 2018, Chris White connected DJ Risk via email to Derrick Skillings, Shaner Hotel Group's Chief Investment Officer. Byron Garman, then-Vice President of Business Development at Paul Risk Associates, Inc., was copied on Mr. White's introductory email, a true

---

[4] It bears noting that Blackford Development Group was founded by Richard Welkowitz, who committed suicide in 2019, shortly after his firm introduced Plaintiffs to Defendants. Welkowitz's estate faced $186 million in fraud and unpaid loan claims by January 2020. *See* "Welkowitz estate sues to dismiss $22M in claims, attorneys say lending agreements have forged signature" by Justin Henry, *Central Penn Business Journal* (Sept. 11, 2020). Upon information and belief, the perpetuator of a massive fraud scheme assisted in the perpetuation of a fraud upon Plaintiffs.

and correct copy of which is attached hereto as **<u>Exhibit 1</u>**. Therein, Mr. White wrote in relevant portion as follows:

> Wanted to do an e-mail introduction of everyone in hopes to [sic] getting a call scheduled in the next few days regarding the hotel opportunity/possible partnership between your great groups.
>
> DJ Risk is the CEO of Paul Risk and the reputation of him and his company is second to none. Byron works with DJ and his added experience will be an asset as well in the discussions. They would be an ideal partner who has the experience and ability to partner on this project.
> Derek Skillings is a valued executive with Shaner who helps the organization underwrite not only locations but also viable business partners/opportunities. His knowledge in the industry is second to none.

29.    A brief conference call was held on January 12, 2018, and Messrs. Skillings and Risk agreed to meet in person to discuss the investment further.

30.    On February 8, 2018, DJ Risk met in person with Derrick Skillings and Bill Hoy, Shaner Hotel Group's Vice President for Development Planning and Construction at a hotel owned by Defendant Shaner Hotel Group in Mechanicsburg, Pennsylvania.

31.    At that meeting, Messrs. Risk, Skillings and Hoy determined that Shaner Hotel Group and Paul Risk Associates, Inc. had complimentary building styles, and that a collaborative project involving construction of a hotel by Paul Risk Associates, Inc., investment by Plaintiffs into the Hotel, and management of the Hotel by the Hotel Manager appealed to all present.

32.    Plaintiffs also met with Defendant Lance Shaner and his leadership team on June 22, 2018. At both the February 8, 2018 meeting and the June 22, 2018 meeting, Derrick Skillings, Bill Hoy and Defendant Lance Shaner represented the following to DJ Risk with respect to the Hotel Project investment:

a.    DJ Risk should form an entity – which would become R-Hotel – for the purpose of investing in the Hotel Project proposed by Shaner Hotel Group;

b. DJ Risk's entity would partner with an entity controlled by Shaner Hotel Group and/or Lance T. Shaner;

c. DJ Risk's entity and the Shaner-controlled entity would each initially invest $1.75 million investment into the development and operation of the Hotel, for a total $3.5 million investment;

d. Paul Risk Associates, Inc. would build the Hotel;

e. The Hotel Manager would operate the Hotel;

f. Based on income generated by Shaner Hotel Group's other properties in the area, the Hotel was projected to distribute $500,000 each year to the partnership, of which DJ Risk's entity would receive $250,000;

g. The partnership's total $3.5 million investment would constitute 25 percent of the funding for the Hotel Project, the other 75 percent would be obtained through an 84-month term construction mini-perm loan of $10.5 million at a fixed five percent interest rate;

h. After one year of hotel operations, Shaner Hotel Group would refinance the Hotel; and

i. Five years after the initial investment in the Hotel Project, the Hotel would be sold, allowing investors who elected not to exit after year one to recoup their initial investment as well as possible additional sums.

33.    Based upon the Shaner Hotel Group's prospectus and the representations of Defendant Lance Shaner, Derrick Skillings and Bill Hoy on behalf of the Shaner Hotel Group, Plaintiffs understood that their entity would earn the construction contract for the Hotel, invest $1.75 million in the Hotel Project for up to five years, receive $250,000 per year for each year that

their entity remained invested in the Hotel Project, and – worst case scenario – exit the deal after the Hotel was refinanced one year post-construction or upon the sale of the Hotel after five years.

34.    The prospectus indicated that Shaner Hotel Group had completed due diligence, purchased the land and received approvals on "height, setback and landscape variances." *Id.* p. 3.

35.    The prospectus' pro forma projected $656,155 in cash flow in the first year of Hotel operations, growing to $5,501,618 in the fifth year of Hotel operations. *Id.* p. 9.

36.    The projected annual net income of the Hotel ranged from $1,215,217 in the first year of operation to $1,420,168 in the fifth year of operation – more than enough for the investors to receive their promised $250,000 annual investment income. *Id.* p. 10.

37.    The prospectus included rosy financial projections for the Hotel Project, and touted the positioning of the Hotel in the local marketplace. *Id*.

38.    DJ Risk believed the representations of the Shaner Hotel Group, by and through its agents Derrick Skillings and Bill Hoy and in its prospectus transmitted via electronic mail, because the Shaner Hotel Group was a dominant force in the western Pennsylvania hotel market and beyond. As such, it made sense that Shaner Hotel Group would propose investments to potential partners on the basis of reliable and truthful comparables and projections. *Id.* pp. 14-16.

39.    Indeed, upon information and belief, Shaner Hotel Group operates six hotels in this area: Hampton Inn & Suites by the Park, Hershey Courtyard, Harrisburg Fairfield & Suites, Lebanon Fairfield Inn & Suites, Mechanicsburg Courtyard, and the subject of the instant action, Mechanicsburg Fairfield Inn & Suites.[5]

---

[5] The Hotel Project was to be constructed on property that included a second hotel pad and a restaurant pad. Shaner, Skillings and Hoy, as well as other representatives of Shaner Hotel Group, further enticed Plaintiffs to form R-Hotel and invest in the Hotel via partnership in the Company by offering Plaintiffs the opportunity to extract "earnings" after their first year of investment in the Hotel (via the Company) to roll into construction of a potential TownePlace Suites Hotel on the second hotel pad and/or construction of a restaurant on the restaurant pad – with Paul Risk Associates receiving the construction contract for those projects. Of course, neither came to fruition.

40.    DJ Risk presented the Shaner Hotel Group's prospectus and the representations of Derrick Skillings and Bill Hoy on behalf of the Shaner Hotel Group to his wife, Plaintiff Amy Rineer, and to his parents, Plaintiffs Steve and Kim Risk.

41.    These individual Plaintiffs were well versed in commercial construction, but not in hotel management.

42.    The Shaner Hotel Group's proforma was intended to induce investors unfamiliar with hotel development and hospitality management to invest in the Hotel Project.

43.    The Shaner Hotel Group's proforma omitted key elements required for an adequate investment disclosure for an offering of this size, including:

  a.   discussion of the risk factors attendant to the investment;

  b.   suitability of this investment opportunity for individual investors;

  c.   clear identification of existing or potential conflicts of interest;

  d.   information about federal and state securities investment registration status (and any applicable exemption); and

  e.   explication of the terms of the investment's operating agreement and management structure. *Id*.

44.    The Plaintiffs were never informed of – and the proforma and representations by Messrs. Skillings and Hoy did not disclose – the conflict of interest created by the Hotel Manager's exclusive management contract with the Hotel.

---

Later in the parties' relationship, Shaner, Skillings and Hoy, as well as other representatives of Shaner Hotel Group, offered Plaintiffs a second opportunity to "partner" with Shaner Hotel Group in the purchase and rehabilitation of a hotel in Hershey, Pennsylvania. The Shaner Hotel Group provided Plaintiffs with a similar proforma, promising generous returns on investment. Of course, Plaintiffs were rendered illiquid as a result of their investment in a partnership interest in the Company, and could not investigate this "opportunity."

45.    Upon information and belief, and unbeknownst to Plaintiffs in 2018, the proforma's representation that investors would receive substantial year one distributable cash flow is not a realistic prediction for a newly constructed hotel.

46.    Upon information and belief, and unbeknownst to Plaintiffs in 2018, the proforma's projection of 70 percent or greater occupancy levels from the Hotel opening onward is similarly unfeasible for any hotel. Even when the Hotel's occupancy approached 70 percent in and around 2024, no distributions were made to Plaintiffs.

47.    Upon information and belief, and unbeknownst to Plaintiffs in 2018, the proforma's suggestion that equity investors in the Company would ultimately receive a 21.28 percent internal rate of return was entirely fanciful. *Id.*

48.    Shaner Hotel Group's promise that Plaintiffs' $1.75 million initial capital contribution would be returned after one year of Hotel operation was knowingly incorrect and fraudulent, insofar as Shaner Hotel Group did not contemplate return of capital contributions, even in the best-case scenario, until a sale or refinance of the Hotel in year five of the investment. *Id.*

49.    On February 9, 2018, Bill Hoy electronically transmitted via ShareFile link to DJ Risk "all the Fairfield Inn and Suites prototype documents."

50.    On February 15, 2018, Bill Hoy, on behalf of the Shaner Hotel Group, visited the Paul Risk Associates, Inc. office in Quarryville, Pennsylvania.

51.    On March 1, 2018, Derrick Skillings emailed DJ Risk a copy of the Shaner Hotel Group's prospectus, entitled "Delta Pointe Fairfield Inn and Suites Mechanicsburg, PA," a true and correct copy of which is attached hereto as **Exhibit 2**.

52.    On March 8, 2018, DJ Risk responded to Derrick Skillings via email with the following questions:

11

1. Questions in regards to the financial investment piece
   a. Assuming the $3.5mil Equity piece would be funded 50/50 by the Shaner/Risk LLC group so looking at $1.75mil initial investment and financing $10.5mil
      i. The Shaner/Risk LLC would be cosigning on the10.5mil financing correct?
      ii. I've seen different finance deals with banks and our owners projects where the owner equity goes in first and then the bank finances, is this the same premise or will the bank go first with the owner equity on the tail end. Evaluating the $1.75mil investment and how that is drawn upon, whether we need the entire $1.75mil sitting there in cash ready to go and it all comes out at once or if we are simply cash flowing what is needed on a monthly basis.
   b. Equity Level Returns – Based on the Proforma looking at $500K per year which would be split 50/50 to the Shaner/Risk JV group
2. Uses for the $14mil – Making assumptions as to what each of these numbers represent as stated below
   a. Direct Construction – Overall sitework and construction package
   b. Land Development – Hotel – Land Acquisition and Development
   c. Indirect Construction Costs – Assuming carrying costs etc. but hoping you can elaborate a bit more on what is in this line item
   d. FF&E – Got that one
   e. Pre-Opening – Assuming training, hiring manager, payroll until hotel is operational
   f. Contingency – Got that one
3. Year 5 Pro Forma – What happens in year 5?

A true and correct copy of DJ Risk's March 8, 2018 email to Derrick Skillings is attached hereto as **Exhibit 3**.

53.    Derrick Skillings refused to provide a written response to Plaintiffs' questions about the investment, and instead offered a conference call. Messrs. Skillings and Risk spoke by telephone on March 9, 2018 and met in person at Shaner Hotel Group's headquarters on March 27, 2018.

54.    On April 25, 2018, Derrick Skilling transmitted a Letter of Intent to DJ Risk, a true and correct copy of which is attached hereto as **Exhibit 4**.

55.    Amy Rineer, DJ Risk, Steve Risk and Kim Risk formed R-Hotel in June 2018 for the purpose of investing in the Hotel Project on the terms set forth by Shaner Hotel Group in the electronically transmitted proforma and by and through its agents Derrick Skillings and Bill Hoy.

12

56.     Throughout the summer of 2018, DJ Risk, on behalf of R-Hotel, and Derrick Skilling, on behalf of the Defendants, transmitted and executed various agreements with respect to financing, Hotel management and ground lease agreements for the Hotel Project.

57.     Paul Risk Associates, Inc.'s principals were invited to participate in Shaner's annual golf classic on August 9 and 10, 2018.

58.     DJ Risk and Byron Garman were paired with Matthew Raptosh at the golf event. Derrick Skillings introduced Matthew Raptosh, who became a Managing Director at Berkadia Capital in January 2018, as "the guy who puts the financial package together" and could help Paul Risk Associates, Inc. finance future construction projects. Mr. Raptosh, who worked for Shaner from May 2013 to January 2016, told Mr. Risk that if he brought Mr. Raptosh construction projects to finance, he could earn a three percent finder's fee.

59.     Mr. Raptosh did, indeed, secure initial construction financing for the Hotel Project through Pennian Bank in January 2019, as set forth hereinbelow.

*R-Hotel Invests in the Company*

60.     The principals of R-Hotel relied to their detriment on the representations, omissions and promises of Defendant Shaner Hotel Group and elected to invest in the Company through R-Hotel's membership therein.

61.     The Company is governed by a Limited Liability Company Agreement dated September 19, 2018 (as amended to date, the "LLC Agreement," a true and correct copy of which is attached hereto as **Exhibit 5**).

62.     The Company is managed by the Investment Manager pursuant to Sections 6.1 through 6.4 of the LLC Agreement. *See* Ex. 5 at §§ 6.1-6.4.

63.     The initial capital contribution required under the LLC Agreement is $250,000, and the total committed capital is $1,750,000. *See* Ex. 5 at Schedule I thereto.

64.     In September 2018, R-Hotel made a $1,750,000 capital contribution to the Company and became the owner of a fifty percent ownership interest in the Company.

65.     Attendant to the investment by R-Hotel and the Shaner Member in the Company, which provided $3.5 million in capital to the Company towards the Hotel Project, the remainder of the cost of the Hotel Project was financed by a loan memorialized by a Construction Loan Agreement dated January 15, 2019 in the maximum principal amount of $10.5 million.

66.     The Construction Loan Agreement was evidenced by a Term Note, a true and correct copy of which is attached hereto, together with the Construction Loan Agreement, as **<u>Exhibit 6</u>**. The Term Note was executed by Defendant Lance Shaner as Trustee of The Lance T. Shaner Revocable Trust, as the sole Member of the Investment Manager. *Id.* The guarantors of the Construction Loan Agreement were Defendant Lance Shaner as President of the Hotel Manager's General Partner, Kenneth Mayville as Managing Member of Defendant Shaner Member, and Plaintiff R-Hotel. *Id.*

67.     Under the terms of the Construction Loan, the first two years of the financing – between February 15, 2019 and February 15, 2021 – the Company would pay interest only. *Id.* § 2.

68.     Paul Risk Associates, Inc. commenced construction of the Hotel in 2019.

69.     Between March 2020 and June 2020, the project faced a mandatory construction stoppage due to the Covid-19 pandemic.

70.     The Hotel opened for Business in November 2020, in the midst of a worldwide pandemic.

71.     The first year of operations at the Hotel was not profitable.

72.    Derrick Skillings, on behalf of Defendants, assured DJ Risk, on behalf of Plaintiffs, that the Hotel's poor performance in 2020 was an anomaly attributable to decreased travel during the pandemic.

73.    As the end of the two-year interest-only period approached, the Hotel was not making sufficient income to repay the Construction Loan.

74.    Accordingly, on February 17, 2021, Pennian Bank entered into an initial loan extension and amended note (the "Loan Modification Agreement" and "Amended and Restated Term Note," a true and correct copy of which are attached hereto collectively as **Exhibit 7**) with Lance T. Shaner as Trustee of the Shaner Trust, which is the Member of the Investment Manager. *Id.*

75.    The Loan Modification Agreement extended the interest-only payment period through July 15, 2021. *Id.*

76.    The Hotel Manager, the Shaner Member and R-Hotel guaranteed the Loan Modification Agreement.

77.    Throughout the investment, Defendants repeatedly informed and assured DJ Risk, a construction contractor unfamiliar with hospitality management, that the Hotel's inability to generate the promised $250,000 annual income stream was a result of the Covid-19 pandemic, and that Hotel revenue would increase and provide R-Hotel with the promised $250,000 annual return on its investment in the Company.

78.    July 2021 approached, but under the management of the Hotel Manager and at the direction of the Investment Manager, the Hotel continued to struggle financially and did not produce income sufficient to meet the debt burden imposed by the Amended and Restated Term Note with Pennian Bank loan.

79.     In November 2021, after the first year of Hotel operations, DJ Risk asked Derrick Skillings when the Amended and Restated Term Note with Pennian Bank would be refinanced, allowing R-Hotel to begin drawing the promised $250,000 annual income or to exit the investment in the Company.

80.     Derrick Skillings, on behalf of Defendants, responded that lenders were not offering financing to hotels because of Covid, and patience would be necessary to recoup R-Hotel's investment in the Company.

81.     Throughout this period, upon information and belief, Defendants sought to engross DJ Risk in the onerous task of formulating bids for other Shaner projects, in order to distract R-Hotel from the dismal performance of its investment in the Hotel Project and entice R-Hotel to cooperate with the Investment Manager's management decisions for the Company.

82.     The proposed "distraction" projects were either very small or were never intended to be awarded to Paul Risk Associates, Inc.

83.     For example, on January 6, 2023, Bill Hoy transmitted to DJ Risk a Request for Proposal for construction of the TownePlace Suites Harrisburg Hershey.

84.     At a meeting on February 22, 2023 to discuss the project budget, DJ Risk was blindsided by the inclusion of a competing bidder, Chafia Construction LLC. By email dated March 8, 2023, it became evident that Bill Hoy was forwarding DJ Risk's bid details to Chafia Construction LLC.

85.     Eventually, the TownePlace Suites Harrisburg Hershey construction contract was awarded to Chafia Construction LLC.

86.    Upon information and belief, Chafia Construction LLC is owned and operated by Jim Kwon, founder and owner of Chafia Capital Partners, which has engaged in several hotel "investments" with Shaner that are identical to the construct foisted upon R-Hotel.

87.    By way of another example, on February 1, 2023, Bill Hoy asked DJ Risk to submit a pricing proposal for renovations to the Fairfield Inn & Suites Harrisburg International Airport. DJ Risk submitted a proposal on behalf of Paul Risk Associates, Inc. on February 13, 2023 and completed the small project, worth less than $16,000, in May 2023.

88.    A Second Loan Modification Agreement was executed by Lance T. Shaner as Trustee of the Shaner Trust, which is the Member of the Investment Manager and Pennian Bank in May 2023. A true and correct copy of the Second Loan Modification Agreement is attached hereto as **Exhibit 8**.

89.    The Second Loan Modification Agreement required the Investment Manager to provide Pennian Bank with monthly and annual balance sheets, statements of income, retained earnings, and changes in financial position, as well as occupancy, ADR and STR reports of the Hotel. *Id.* § 4.  It also excused the Investment Manager's failure to comply with the debt service ratio requirements. *Id.* § 5.

90.    The Hotel Manager, the Shaner Member and R-Hotel guaranteed the Second Loan Modification Agreement.

91.    No corresponding amended Note was executed in May 2023 in conjunction with the Second Loan Modification Agreement.

92.    In January 2024, without notice to or consent of Plaintiff, the Investment Manager caused the Company to enter into a Third Loan Modification Agreement with Pennian Bank, memorialized by a contemporaneous Second Amended and Restated Term Note in the amount of

$9,710,689.02, which was executed with Pennian Bank by Defendant Lance T. Shaner, as Trustee of the Shaner Trust, as member of the Investment Manager, as manager of the Company. A true and correct copy of the Third Loan Modification Agreement and Second Amended and Restated Term Note are collectively attached hereto as **Exhibit 9**.

93.    Therein, the loan maturity date was extended to April 15, 2024 and the interest rate was increased from 5.22 percent to 9.5 percent *Id.* §§ 1(a), 2(b). Prior monthly debt payments of $63,834.12 increased under the Second Amended and Restated Term Note to 85,596.08. *Id.* § 2(a).

94.    Derrick Skillings, on behalf of the Investment Manager, transmitted a signature page to DJ Risk on behalf of R-Hotel in January 2024, but did not transmit or disclose the material terms of the Third Loan Modification Agreement and/or the Second Amended and Restated Term Note with Pennian Bank to Plaintiff.

95.    The Investment Manager was required under the terms of Section 6.4 of the LLC Agreement to obtain the written consent of 75 percent of the members of the Company in order to finance the Hotel Project, but did not obtain R-Hotel's consent for or disclose the terms of the Third Loan Modification Agreement and/or the Second Amended and Restated Term Note. *See* Ex. 5 at § 6.4.

96.    Initially, the members of R-Hotel believed Defendants' representations that the Hotel would become profitable and produce the promised annual return.

97.    Throughout the investment, and as late as January 2024, R-Hotel's managing member, DJ Risk, made good faith but ultimately unsuccessful inquiries to assist Shaner Hotel Group and the Investment Manager in seeking alternative funding to replace the Pennian Bank loan at the time of execution of the Second Amended and Restated Term Note.

98.    No distributions have *ever* been made to R-Hotel, though Defendant Hotel Manager received substantial hotel management fees from the Company. Shaner Hotel Group promised that in year five of the investment, the Hotel would be refinanced, and R-Hotel could exit its investment in the Company. Year five of the investment was 2023, and no exit from the investment was achieved.

99.    Instead, the Hotel has struggled financially from the outset.

100.    On April 4, 2024, without providing notice to or seeking the consent of R-Hotel or any of the other Plaintiffs, the Investment Manager caused the Company to enter into a Fourth Loan Modification Agreement and Third Amended and Restated Term Note, a true and correct copy of which are collectively attached hereto as **Exhibit 10**.

101.    The Fourth Loan Modification Agreement extended the Pennian Loan maturity date to December 22, 2025 and included a requirement that the Company meet quarterly with Pennian Bank "regarding Borrower's efforts and prospects for refinancing the Loan with another lender and/or selling the Mortgaged Premises." *Id.* § 4.D.

102.    It also required that Lance T. "Shaner will execute and deliver an unlimited, unconditional guaranty (the "**Shaner Guaranty**") further securing Borrower's Obligations under the Loan Agreement, the Note and the other Loan Documents." *Id.* § 6.

103.    The signature page of the Fourth Loan Modification Agreement was transmitted to DJ Risk on behalf of R-Hotel for execution in a March 1, 2024 email from Mr. Skillings, who wrote simply: "Hope all is well.  Can you sign and return the attached when you have a moment?  We're close to having the extension documented with Pennian.  Will give us more time to find a takeout by Dec 15, 2025.  Let me know if you have any questions." A true and correct copy of Mr. Skillings'

March 1, 2024 email to DJ Risk is attached hereto as **Exhibit 11**. But R-Hotel was not provided

with the body of the Fourth Loan Modification Agreement.

104.    Crucially, the Third Amended and Restated Term Note contains the following

alteration to the loan's payment terms:

> In addition to the regularly scheduled monthly installments of principal and interest set forth in Section 2(a) above, beginning on **July 15, 2024**, and continuing quarterly thereafter on **October 15th, January 15th, April 15th, July 15th** (as applicable) of each year, Borrower shall make quarterly principal prepayments, each in the amount of **$250,000** . . .

*Id.* § 2(b) (boldface in original).

105.    The Third Amended and Restated Term Note, and the content of Section 2(b)

thereof, was not transmitted or disclosed to any of the Plaintiffs.

106.    On July 9, 2024, DJ Risk emailed Shaner Hotel Group's Chief Investment Officer,

Derrick Skillings, asking for a buyout of R-Hotel's investment in the Company, to wit: "Is there

anyone you are currently working with on other hotel deals that may be interested in buying the R-

Hotel entity and taking our portion of ownership of the hotel in Mechanicsburg? Let me know if

you have any thoughts, thank you!" A true and correct copy of DJ Risk's July 9, 2024 email to

Derrick Skillings is attached hereto as **Exhibit 12**.

107.    Mr. Skillings replied on July 15, 2024 in relevant portion as follows: "We're

working on a few transactions that will close early next month so its [sic] been quite intense here

lately. Unfortunately I don't have any thoughts for a take out source for [the Hotel in]

Mechanicsburg at this time. Pennian gave us a 24 month extension so we will continue to work on

a recapitalization strategy for the asset. Thanks[.]" *Id.*

108.    Thus, more than three months after the Company's April 4, 2024 execution of the

Fourth Loan Modification Agreement, Plaintiff – a *guarantor* of the Pennian Bank loan and a

*Member* of the Company – was learning of a nebulous 24-month extension on the existing loan for the first time.

109.    As set forth hereinabove, the Investment Manager was required under the terms of Section 6.4 of the LLC Agreement to obtain the written consent of 75 percent of the members of the Company in order to finance the Hotel Project, but did not obtain R-Hotel's consent for or disclose the terms of the Fourth Loan Modification Agreement or the existence of the Third Amended and Restated Term Note, including Pennian Bank's requirement of $250,000 in quarterly principal paydowns. *See* Ex. 5 at § 6.4.

110.    At the time, under the control of the Investment Manager and based upon the Hotel's cash flow under the management of the Hotel Manager, the Company lacked sufficient liquidity to fund the $250,000 quarterly principal paydowns set forth in Section 2(b) of the Third Amended and Restated Term Note with Pennian Bank.

111.    Thereupon, the Shaner Member, which is controlled by Defendant Lance Shaner, unilaterally contributed $2.8 million to the Company in order to fund the $250,000 quarterly principal paydowns set forth in Section 2(b) of the Third Amended and Restated Term Note with Pennian Bank, and to fund other financing expenses and accrued accounts payable.

112.    Upon information and belief, Defendant Lance Shaner was incentivized to make this unlawful $2.8 million payment to the Company in order to avoid default on the Fourth Loan Modification Agreement and the Third Amended and Restated Term Note, which he *personally* guaranteed.

113.    None of the Company, the Investment Manager or the Shaner Member disclosed to R-Hotel or any other Plaintiff that the Shaner Member contributed $2.8 million – either in the form

of unauthorized loans to the Company or unauthorized Additional Capital Contributions[6] – to the Company.

114.    Again, the Investment Manager was required under the terms of Section 6.4 of the LLC Agreement to obtain the written consent of 75 percent of the members of the Company in order to finance the Hotel Project. *See* Ex. 5 at § 6.4.

115.    The Investment Manager did not obtain the consent of R-Hotel, which holds 50 percent of the membership interests in the Company, prior to accepting $2.8 million in funding from the Shaner Member.

116.    The Company and the Investment Manager deliberately concealed the Investment Manager's breach of the LLC Agreement and the breach of its fiduciary duty to R-Hotel.

117.    After Derrick Skillings' July 15, 2024 disclosure to DJ Risk that "Pennian gave us a 24 month extension," upon information and belief, Defendants sought to hide from Plaintiffs both (1) the terms of the Third Amended and Restated Term Note, specifically the quarterly principal paydown requirement, and (2) the $2.8 million funding by the Shaner Member at the behest of Lance Shaner.

118.    Therefore, immediately before the first quarterly principal payment was due to Pennian Bank, the Investment Manager stopped providing R-Hotel with monthly financial reports required under Section 8.4 of the LLC Agreement.

119.    Thus, Plaintiffs remained unaware of Defendants' financing malfeasance because the Investment Manager stopped providing contractually required monthly reports.

---

[6] Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the LLC Agreement. The Shaner Member's unauthorized contributions were eventually disclosed and confirmed in writing in an exhibit to an August 21, 2025 capital call notice, a true and correct copy of which is attached hereto as **Exhibit 13**.

120.    But by late 2024, sufficiently after the Covid-19 pandemic subsided, with no annual income, the 5 year anniversary of the Hotel's operation on the horizon and no options for refinancing that would allow R-Hotel an investment exit,  Plaintiffs began to realize that the Shaner Hotel Group's 2018 promises were not materializing.

121.    Thereafter, on October 18, 2024, DJ Risk emailed Mr. Skillings again, as follows:

**Unfortunately the hotel has not performed as Shaner Group lead us to believe and we do not see how/when we will ever get a return on this investment.**  If you can provide any insight as to when we will see any kind of cash coming back our way?

The assets that I have committed to the hotel have handcuffed PRC and we need those assets for our future and can not get be [sic] dragged down by this hotel deal that has not delivered what we were told it would be delivering.  **Your proforma was paying out $250k per year, how/when do we get there** when the hotel is behind projections every year?

We are going to look to sell R-Hotel entity at $3m, would Shaner like the opportunity to buy us out or do you have another partner who would?  Would Owen take the full hotel or perhaps Jim Kwon?  We have another group we work that builds/manages hotels for themselves and could be an option.

We need to see cash this year or we have to get out of this deal, **the performance we were promised and what we have received are not the same and we can no longer go down this road with Shaner**.

Please let me know next steps in order to get this resolved.  Thank you! – DJ

A true and correct copy of DJ Risk's October 18, 2024 email to Derrick Skillings is attached hereto as **Exhibit 14** (emphasis supplied).

122.    DJ Risk sought buyout opportunities from both Kenneth Mayville, the Managing Member of Defendant Shaner Member, and Jim Kwon, founder and owner of Chafia Capital Partners, but neither was interested in purchasing R-Hotel's investment interest in the Company.

123.    In a desperate February 12, 2025 email to Derrick Skillings and Plato Ghinos, President of Shaner Hotel Group, DJ Risk stated:

The hotel has been in operation for 5 years and we have not seen any return on our investment. When we agreed to this partnership the premise was that we would get our initial investment back out within 2 years when we refinance the property. Your projections showed payouts of approximately $250,000 per year.  None of this has materialized, we understand that COVID and the financial climate for refinancing hotel properties drastically changed from when we entered into this agreement, however the fact we have seen zero return on our investment is concerning.

R-Hotel is kindly requesting a written plan of action from Shaner Group, the entity in charge of managing the hotel, as to what actions are being taken to make this property profitable and when R-Hotel can expect to recoup our initial investment and receive payments from the hotel per the initial premise of this agreement.  Please provide this plan in writing by February 21, 2025.

A true and correct copy of the email chain initiated by DJ Risk on February 12, 2025 is attached hereto as **Exhibit 15.**

124.    Mr. Ghinos forwarded DJ Risk's request for a written plan of action to Elias Thompson, a Regional Vice President of Operations for Shaner Hotel Group, and Lisa Larson, Shaner Hotel Group's Global Hotel Operations Officer, who included Derrick Skillings in their response.

125.    On February 19, 2025, Mr. Skillings himself finally responded to DJ Risk's February 12 email in relevant portion as follows:

The market continues to feel the effects of covid as several room night generators have yet to return to the market while supply has increased.  The operations and sales teams continue to focus on leading the market, growing market share and cash flowing incremental revenue gains. . . .

Separately, we also need to discuss the upcoming debt maturity and current capital needs.

The Pennian loan will be paid down to approximately $7.8MM as of the December 2025 loan maturity.  The lender has made it clear that they want us to find a takeout solution which we will continue to explore during the course of 2025.  **Per the loan modification and extension, the lender required quarterly paydowns of $250k** and personal recourse to Lance.  As of 1/31/2025, the loan balance is currently $8.556MM.

**Owen Investors has been funding the mandatory loan repayments in an amount of $1.47MM to date and the management company has been carrying the working capital needs in an amount of $508k to date which total approximately $1.981MM combined per the attached schedule**. Lets [sic] discuss the capital account true up for the partnership carry costs contributed by Owen Investors and the management company to date and the needs for 2025 on the path to a refinance later this year.

We have also explored a potential sale of the asset however the latest broker opinion of value we received in the fall estimates a sale value between $8.7MM and $10.2MM with a target of $9.5MM. We will update the analysis early this year however a sale is not a viable option at this time.

Lance is committed to the asset and the partnership over the long term however the market challenges continue to persist. Our goal this year is to focus on leading the market and paying down the debt further while we search for a debt takeout solution. . . .

*Id.* (emphasis supplied).

126.    Thus, instead of providing the requested written plan of action, Derrick Skillings (on behalf of the Shaner Hotel Group and/or the Investment Manager) instead revealed the unlawful and previously hidden contributions from the Shaner Member (at the direction and under the control of Lance Shaner) to the Company, announced R-Hotel's purported resulting debt (and need for a "true up") and revealed Lance Shaner's personal guarantee of the loan.

127.    Astounded by this news, DJ Risk responded:

We are disappointed in where this partnership has gone, we asked for a plan of action to provide a path to profitability for the Fairfield Inn and Suites and received notice that the partnership has spent an additional $1.981MM **with no prior communication about these expenditures**.

We entered into this partnership under your guidance and leadership that we would be able to get our initial investment out after a year and we could anticipate receiving $250,000/year in profit from the hotel. We have not experienced any of that, quite the opposite actually, spending an additional $750K of our own money to fund the initial investment that was supposed to be returned to us after the first year.

Which loan modification required the additional $250K quarterly payments?

> As I have expressed to you numerous times through 2023 and 2024, we need an understanding of when this hotel is going to start generating a return on our investment.

*Id.*

128.    Receiving no response, DJ Risk again emailed Mr. Skillings, copying Mr. Ghinos, as follows:

> I have not received any update, I kindly request an update on the following by COB Friday.
>
> 1. Which Loan Modification required the additional quarterly payments?  When and How was this communicated to R-Hotel, your partner?
>
> 2. What is the plan for refinancing the project at the end of 2025?
>
> 3. What date is Shaner Group projecting this property to become profitable?

*Id.*

129.    Mr. Skillings responded by email on June 11, 2025, *finally* attaching the Third Amended and Restated Term Note with Pennian Bank as well as an April 7, 2025 letter from X-Caliber Rural Capital to Mr. Skillings setting forth the terms of a proposed $8.45 million loan. Mr. Skilling's email to DJ Risk states in relevant portion as follows:

> Here is the term note amendment requiring the quarterly principal repayments.  This was necessary to get the extension.
>
> I'm also attaching the term sheet from XRC to take out Pennian before the Dec maturity. . . .   Unfortunately it is the only interested lender we have on this one. When you review, please note the Guarantor clause on page 1 whereby any owner with 20% or more interest in the borrower needs to guaranty the loan. I believe both Owen Investors and R Holel [sic] are single purpose LLCs that were created to solely own this asset and do not have any other holdings. Is that the case for R Hotel?
>
> . . . Lance is committed to the asset and the partnership over the long term however the market challenges continue to persist.  Our entire team is focused on this asset every day to drive as much revenue as possible and control every dollar spent.

*Id.*

130.    DJ Risk replied on June 23, 2025 in relevant portion as follows:

I do understand as the managing partner you have alot of leeway with capital calls and financing but **I'm trying to understand how/when R-Hotel was notified that the terms of our loan were changed**? I signed several Loan Modifications including modifications 3 and 4 which appear to be on each side of **this Third Amended and Restated Term Note which I did not sign. It's unfortunate that our partnership committed this additional capital with no knowledge of R-Hotel who could've taken the opportunity to plan accordingly**.

At this point and time, I'm not in a position to sign off on the new loan until there is a clear understanding of how the additionally contributed capital came about in 2024 without informing R-Hotel, how that impacts the partnership moving forward, and how/when R-Hotel can expect to recoup our original $1.75m investment.

I have been very upfront and open about our position since the day we sat down with Owen at the property so **it's very concerning to learn about these items after the fact**. Please let me know what we can do to make this partnership work, thank you!

*Id.* (emphasis supplied).

131.    After R-Hotel was informed of the long-hidden requirement of quarterly $250,000 principal paydowns and the unlawful $2.8 million contribution from the Shaner Member, the Investment Manager resumed the provision of monthly reports in April 2025.

132.    In a July 9, 2025 phone call with DJ Risk, Mr. Skillings acknowledged on behalf of Shaner Hotel Group that none of Shaner Hotel Group, the Company or the Investment Manager notified R-Hotel of the Shaner Member's $2.8 million additional contributions to the Company.

133.    In that conversation, Mr. Skillings acknowledged that the Shaner Member's "loan" to the Company was unauthorized and was made without R-Hotel's consent.

134.    On July 10, 2025, Mr. Skillings requested certain due diligence items from DJ Risk on behalf of R-Hotel in support of yet another refinance of the Pennian Bank loan.

135.    DJ Risk responded in relevant portion as follows by email that same day:

Shaner Group partnered with our family due to our expertise in construction, we partnered with Shaner group due to your expertise in hotel management. Paul Risk

27

Construction delivered a project cost and delivered on that cost, Shaner Group delivered a path to recoup our initial investment after year 1 and anticipate $250K/year income from the hotel partnership and have not delivered that nor can provide a path forward as to when we can expect our $1,750,000 investment back.

**This is not a path that R-Hotel can continue on with the Shaner Group. I've been inquiring about a buyout option since our meeting in June of 2023, have been asking for refinance updates bi-monthly, and was delivered a "Capital Needs" of $1,981,431 spent to date with an additional $870,000 for a total of $2,851,431, 14 months after the fact and 'sorry we should've communicated better.'** This loan moving in front of our initial investment will never allow us to recoup our money.

During the time period that I have been requesting a buyout option, Shaner Group has built or acquired the following 13 properties; The Inn at Bellefield, Homewood Suites by Hilton Columbus OSU, AC Hotel by Marriott Dayton, Comfort Inn & Suites Newark Liberty Airport, Carnegie House, Doubletree by Hilton Huntington, Courtyard by Marriott Hamilton, Daytona Beach Homewood Suites, Le Meridien Atlanta Perimeter, AC Hotel by Marriott Brecksville, Hampton Inn & Suites Destin, Hotel Celare, and a Partnership with the NFL Cleveland Browns.

R-Hotel would like to formally request our $1,750,000 investment back from the Shaner Group in exchange for our 50% stake in the Mechanicsburg Fairfield Inn & Suites. We feel this is a fair ask without taking into account the additional capital spent by R-Hotel during this time, $250,000/year Shaner profit projections that have not materialized, and the fact that **Shaner Group was able to provide $1,981,431 in capital needs for the hotel without our knowledge**, surely this should be an easily attainable and mutually agreeable settlement to go our separate ways . . . .

A true and correct copy of the July 10, 2025 email chain is attached hereto as **Exhibit 16**.

136.    Mr. Skillings responded on behalf of Shaner Hotel Group as follows:

Our team had the chance to meet late last week to discuss the Mechanicsburg FIS performance and near term debt maturity. The current lender has been quite difficult and adamant that we find a take out solution which has been our priority for this asset. The personal and corporate recourse to Lance [Shaner] required to extend the [Pennian] loan pose many challenges and have been of highest priority to find a solution.

We found a solution in XRC, a lender we have closed with in the past, that will refinance the existing Pennian balance and all closing costs at a significant savings in annual P&I to the current loan. . . .

While we do not have a buyout option to propose today, Lance is amenable to distributing excess cash flow from operations to the partners prorata ahead of his

loan [through Shaner Partner] that was contributed and used to paydown Pennian as a condition to the extension. Based on our current forecast, we believe there may be some excess cash flow from operations to distribute over the next 12-18 months under the new XRC debt facility.

We will need your cooperation to close the loan with XRC which is our only option to refinance at this time. The capital markets continue to be a challenge and any alternatives with Pennian are bleak. . . .

*Id.*

137.    Thus, in exchange for forgiving the breaches of the LLC Agreement, the Investment Manager was offering weak assurances that Lance Shaner's loan to the Company (through the Shaner Member) would take second priority to R-Hotel's investment and the Hotel *might eventually* throw off some income to R-Hotel.

138.    Based on the Defendants' fraudulent and underhanded past practices, R-Hotel refused to co-sign another refinance. DJ Risk noted in his response that the Defendants surreptitiously secured "$2mil capital contributions to the Partnership putting our initial investment in 2nd position [and t]here was no communication or consent given for this additional capital to be infused into the project and you dropped this information on us 10 months after the fact. When I requested documentation to how this occurred you danced around it for several months until I finally got the note that was not signed off on by R-Hotel." *Id.*

139.    DJ Risk added that "Jalen Devier-Lucas [w]as sending monthly financial reports to djrisk@paulrisk.com and quit sending the financial reports once the additional capital was contributed to the project. When I inquired about why we haven't seen any financial reports, I was told he had my email wrong, yet he was sending the reports to the correct email prior to the additional capital being contributed to the project." *Id.*

140.    By letter dated August 21, 2025, Shaner Hotel Group's counsel, David Ross, Esquire, conveyed the following demand on behalf of the Investment Manager:

The [Investment] Manager has determined that additional funds are required to pay operating costs and to otherwise satisfy and discharge other liabilities and obligations of the Company. Accordingly, in accordance with Section 3.2(a)(ii) of the Operating Agreement, please accept this correspondence as a request from the [Investment] Manager that all Members make Additional Capital Contributions. The aggregate amount of Additional Capital Contributions requested by the Manager via this Request is $2,754,611.00.

*****

Additionally, please be advised that the 3Q 2025 quarterly principal paydown payment for the Pennian debt is due in the amount of $250,000.00 on or before October 15, 2025 (the "Q3 Principal Paydown"). As you are also aware, the Pennian Debt matures on December 22, 2025, and the expected loan balance due at maturity is approximately $7,885,337.00 (the "Pennian Payoff") The Manager hereby expressly reserves the right to request Additional Capital Contributions to satisfy the Q3 Principal Paydown and the Pennian Payoff.

To be clear, your continued refusal to participate or otherwise consent to the refinance of the Pennian Debt is contrary to the best interests of the Company and may lead to the divesture of your interests therein. The [Investment] Manager reserves all rights in this regard.

A true and correct copy of Mr. Ross' August 21, 2025 demand letter is attached hereto as **Exhibit 17**.

141.    A lien search conducted on January 12, 2026 reveals that Shaner Family Partners, L.P. recorded a mortgage of the Hotel premises on August 29, 2025 (Instrument No. 202518043) in the amount of $ 2.15 million in favor of Centra 1st Bank, a division of Old Dominion National Bank. A true and correct copy of the January 12, 2026 lien search results is attached hereto as **Exhibit 18**. Concurrently, an assignment of leases and rents was also recorded on August 29, 2025 (Instrument No. 202518044). *Id.* p. 2. R-Hotel had no knowledge of the August 29, 2025 mortgage and assignment, and did not give consent to the August 29, 2025 mortgage and assignment.

### *The Investment Manager Repeatedly Breached the LLC Agreement*

142.    As set forth hereinabove, the LLC Agreement is among the Investment Manager (by Lance T. Shaner), the Shaner Member (by Kenneth Mayville) & R-Hotel (by DJ Risk). *See* Ex. 5.

143.    Delaware law controls the LLC Agreement. *Id.* Art. 14.3.

144.    Article 3.2(a)(ii) of the LLC Agreement states:

The Members recognize that the Manager, in its sole discretion, may, at any time (before or after the Construction Period) and from time to time, make additional Capital Calls with respect to Additional Capital Amounts up to an amount of such Member's Additional Capital Amount. . . . the Manager shall make a Capital Call pursuant to this Section 3.2(a)(ii) to fund operating shortfalls, overruns, emergency repairs and for similar purposes commonly identified as outside the ordinary course.

*Id.* Art. 3.2(a)(ii). Thus, "additional Capital Calls" are permitted under Article 3.2(a)(ii) of the LLC Agreement up to the Additional Capital; Amount of the Member receiving the "additional Capital Call."

145.    Article 1.1(a) of the LLC Agreement defines "Additional Capital Amount" as follows:

Additional Capital Amount: As to each Member, **an amount equal to the Additional Capital Amount for such Member as identified on Schedule 1**, less all Capital Contributions previously made by such Member with respect to the Additional Capital Amount exclusive of any Default Contributions made, if any, with respect to the Additional Capital Amount.

*Id.* Art 1.1(a) (emphasis supplied).

146.    "Additional Capital Amount" is not defined or even mentioned in Schedule 1 to the LLC Agreement.

147.    In the August 21, 2025 demand letter, the Investment Manager seeks $1,377,305.50 for principal paydowns and loan costs with respect to the Pennian Loan.

148.    This violates the LLC Agreement insofar as it seeks a contribution that necessarily exceeds the undefined and, discretionary "Additional Capital Amount" allowable thereunder.

149.    Furthermore, the mandatory Capital Call set forth under Article 3.2(a)(ii) of the LLC Agreement is limited in purpose "to fund operating shortfalls, overruns, emergency repairs and for similar purposes commonly identified as outside the ordinary course."

150.    The Investment Manager's request for $1,377,305.50 in Additional Capital Contributions **specifically to fund principal paydowns and loan costs** cannot be cast as a mandatory Capital Call insofar as financing costs are not "operating shortfalls, overruns, emergency repairs and for similar purposes . . ."

151.    As such, the Investment Manager's August 21, 2025 request for Additional Capital Contributions violates Article 3.2(a)(ii) of the LLC Agreement.

152.    Art 6.4 of the LLC Agreement is entitled "Restrictions on the Manager's Authority," and sets forth in relevant part the following restrictions on the Investment Manager's actions"

> The Manager may not, without written consent of 75% of the Members . . . do any of the following . . .
> (d) sell, lease, exchange or refinance all or substantially all of the assets of the Company . . .
> (g) the financing or refinancing of the Hotel Project or the Phase I Property
> (h) the approval of the Annual Budget . . .
> (l) the incurrence, amendment, modification, prepayment, refinancing or extension of any indebtedness, other than
>> (a) the incurrence of trade payables in the ordinary course of business,
>> (B) the incurrence, amendment, modification, prepayment, refinancing or extension of any indebtedness contemplated under the Annual Budget, and
>> (C) the incurrence of indebtedness for emergency repairs or necessary expenses[.]

*Id.* Art. 6.4.

153.    The Investment Manager's acceptance of $2.8 million from Lance Shaner by and through the Shaner Member violates Article 6.4(l) of the LLC Agreement.

154.    The Investment Manager's execution of the Third Amended and Restated Term Note and the Fourth Loan Modification Agreement without the knowledge and consent of R-Hotel violates Art 6.4(d) & (g).

155.    Article 1.1(d) of the LLC Agreement defines "Annual Budget: As defined in the Hotel Management Agreement.

156.    Article 6.5(b) of the LLC Agreement states: " . . . In no event shall an officer perform any act which the Manager may not perform without the approval of the Members as provided in this Agreement."

157.    Mr. Skillings, an officer of the Company, obtained refinancing without disclosing the terms of the Third Amended and Restated Term Note, in violation of Article 6.5(b) of the LLC Agreement.

158.    Article 8.4 of the LLC Agreement is entitled "Monthly Reports," and states: "Within 30 days of end [sic] of each month, the Manager will supply to the Members, [sic] management prepared profit and loss statement, balance sheet, financial comparison of actual results to budget and prior year, and such other information reasonably requested by Members."

159.    Although R-Hotel received certain financial reports regarding the Hotel operations from the Hotel Manager pursuant to the Hotel Management Agreement, discussed *infra,* the Investment Manager *never* transmitted a *single* Monthly Report as required by Article 8.4 of the LLC Agreement.

160.    Moreover, to the extent that the monthly financial statements transmitted via email to R-Hotel by the Hotel Manager pursuant to Article 7.4(a) of the Hotel Management Agreement might somehow simultaneously qualify as "Monthly Reports" under the LLC Agreement (which Plaintiffs maintain they do not), they violate Article 13.3 of the LLC Agreement which requires financial reports to be transmitted by U.S. mail, *not* by email.

*The Hotel Manager Repeatedly Breached the Hotel Management Agreement*

161.    The Hotel Management Agreement is the exclusive operations and management contract among the Company (by Lance T. Shaner "CEO") and the Hotel Manager (by its "President" whose signature is illegible. *See* Ex. 5.

33

162.    The Hotel Management Agreement sets forth a 25 year term wherein the Hotel Manager is to serve as the manager of the Hotel. *Id.* Art. 3.1.

163.    Pennsylvania law controls the Hotel Management Agreement. *Id.* Art. 28.3.

164.    Article 2.2 of the Hotel Management Agreement states:

Manager shall not enter into any agreement or contract for the performance of services or purchase of supplies with any company or entity affiliated with Manager without the prior written approval of Owner in each instance, nor shall Manager bund Owner to any obligation or enter into any contract, the term of which exceeds one (1) year or which exceeds the sum of Ten Thousand Dollars ($10,000) in any single instance without Owner's prior written approval.

165.    In violation of Article 2.2 of the Hotel Management Agreement, the Hotel Manager failed and refused to provide R-Hotel with any agreement for review, consideration or approval after the completion of construction of the Hotel.

166.    Article 7.2 of the Hotel Management Agreement states: "Within ninety (90) days after the end of each fiscal year, Manager shall submit to Owner a balance sheet, a statement of operations and a statement of changes in financial position (the "Annual Financial Statements"), all certified by Manager."

167.    In violation of Article 7.2 of the Hotel Management Agreement, R-Hotel never received certified Annual Financial Statements from the Hotel Manager. R-Hotel did receive certain *monthly* financial statements which included year-to-date results, none of which contained an annual balance sheet, a statement of operations and a statement of changes in financial position, and thus did not qualify as an "Annual Financial Statement under Article 7.2.

168.    Article 7.4(a) of the Hotel Management Agreement states:  "Within twenty (20) days after the end of each month, Manager shall submit to Owner a financial statement showing the results of operation of the Hotel for such month, together with the results of operation for the period from the beginning of the fiscal year to the end of such month . . . ."

34

169.    R-Hotel received a monthly financial statement from the Hotel Manager from the inception of the investment through December 2023, in May and June of 2024, and in April 2025 to the present.[7]

170.    The Hotel Manager violated Section 7.4(a) of the Hotel Management Agreement between January 2024 and April 2024, and between July 2024 and March 2025, by failing to transmit monthly financial statements to R-Hotel.[8]

171.    Importantly, the Hotel Manager stopped providing R-Hotel with financial reports after the Investment Manager secretly executed the Third Amended and Restated Term Note with Pennian Bank, without R-Hotel's knowledge or consent. The financial reports presumably would have reflected the impermissible funding arrangement.

172.    Article 7.4(b) of the Hotel Management Agreement states: " . . . The Manager shall prepare the Annual Business Plan which shall be subject to the review and approval of the Owner."

173.    The Hotel Manager violated Article 7.4(b) of the Hotel Management Agreement by failing to *ever* provide an Annual Business Plan for R-Hotel's review and approval.[9]

174.    Article 11.4 of the Hotel Management Agreement states:

Within ninety (90) days after the end of each fiscal year, Manager shall submit to Owner an "Annual Statement of Manager's Fee," certified by Manager. The Annual Statement of Manager's Fee shall set forth, in reasonable detail, the calculation of manager's Basic Fee and any other fee charged.

[7] Greg Marquardt transmitted the Article 7.4(a) monthly financial statements to R-Hotel on behalf of the Hotel Manager from January 2019 through February 2023. Ethan Schoenleber transmitted the Article 7.4(a) monthly financial statements to R-Hotel on behalf of the Hotel Manager from March 2023 through October 2023. Alyn Shaner transmitted the Article 7.4(a) monthly financial statements to R-Hotel on behalf of the Hotel Manager for November and December 2024. Jalen Deveir-Lucas transmitted the Article 7.4(a) monthly financial statements to R-Hotel on behalf of the Hotel Manager in May and June 2024.
[8] On April 4, 2025, after multiple inquiries from Plaintiffs about the missing monthly reports, Jalen Deveir-Lucas told Plaintiffs that Defendants had the wrong email for DJ Risk.
[9] Although the Hotel Manager's January monthly financial report provided a budget for the upcoming year, this does not constitute an Annual Business Plan under Article 7.4(b) of the Hotel Management Agreement.

175.    The Hotel Manager violated Article 11.4 of the Hotel Management Agreement by failing and refusing to *ever* provide to R-Hotel the required Annual Statement of Manager's Fee.

176.    Article 14.2 of the Hotel Management Agreement states:

Forty five (45) days prior to the beginning of each Fiscal year [sic], Manager shall prepare annually, for Owner's approval, an Annual Capital Budget (which will be submitted to Owner as part of the Annual Business Plan) outlining expenditures for replacements of FF&E and other capital expenditures deemed necessary or desirable by Manager during the ensuing fiscal year [sic].

177.    The Hotel Manager violated Article 14.2 of the Hotel Management Agreement by failing and refusing to *ever* provide to R-Hotel the required Annual Capital Budget.

178.    Article 14.5 of the Hotel Management Agreement states:

Forty five (45) days prior to the beginning of each Fiscal Year of the Operating Term, Manager shall submit to Owner an Annual Operating Budget and an Annual Capital Budget for the operation and maintenance of the Hotel (collectively, such proposed Annual Operating Budget and Annual Capital Budget are referred to as the "Annual Business Plan"). . . In cases of unforeseen circumstances, Manager shall, as promptly as reasonable, inform Owner when the Approved Budget is no longer accurate or has become impractical and shall submit a modified or revised Proposed Budget for such Fiscal Year for Owner's approval and such revised Proposed Budget when approved by Owner shall thereafter become the Approved Budget for such Fiscal Year.

179.    The Hotel Manager violated Article 14.5 of the Hotel Management Agreement by failing and refusing to *ever* provide to R-Hotel the required Annual Business Plan.

### *Shaner Hotel Group Violated Federal and State Investment Registration and Anti-Fraud Laws*

180.    In general, issuers of investment instruments must register those investments with the Securities and Exchange Commission ("SEC") and the corresponding state agency.

181.    The Shaner Hotel Group appears to have relied on exemptions from registration under the Securities Act of 1933 (the "Securities Act") and Pennsylvania "blue sky" laws with respect to this issuance of securities in the Company.

182.    Form D is a form for a notice required to be filed with the SEC by companies and funds selling securities without registering the offering under the Securities Act of 1933 based on a claim of exemption under Rule 504, 505 or 506 of Regulation D or Section 4(6) of that statute. *See* 17 CFR § 239.500

183.    The SEC rules require the notice to be filed within fifteen days of the first sale of securities in the offering based on the exemption.

184.    Section 4(a)(2) exempts "transactions by an issuer not involving any public offering," also known as private placements, from the registration requirement. If an issuer complies with the requirements of Rule 506 of Regulation D, then its offering will fall within Section 4(a)(2) and be considered a private placement.

185.    In this case, the stated basis for exemption from the registration requirement is either Rule 506(b) or Rule 506(c) of Regulation D.

186.    Rule 506(b) states:

Conditions to be met in offerings subject to limitation on manner of offering—
(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.
(2) Specific conditions—
   (i) Limitation on number of purchasers. There are no more than, or the issuer reasonably believes that there are no more than, 35 purchasers of securities from the issuer in offerings under this section in any 90-calendar-day period.
   (ii) Nature of purchasers. **Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description**.

17 CFR § 230.506(b) (emphasis supplied).

187.    There is no indication that either of Shaner Hotel Group verified or had any reasonable basis to form a belief that Plaintiffs "ha[d] such knowledge and experience in financial

and business matters that he is capable of evaluating the merits and risks of the prospective investment" under 17 CFR § 230.506(b)(2)(ii).

188.    As such, the offering of the investment in the Company to Plaintiffs did not qualify for an exemption from federal registration requirements pursuant to Rule 506(b) of Regulation D, and the failure by Defendants Shaner Hotel Group or Investment Manager to register the investment with the Securities and Exchange Commission is fatal to the investment.

189.    Furthermore, if these Shaner Hotel Group based its assumption of federal registration exemption on Rule 506(b), then the investment must meet the requirements of Section 230.501.

190.    Section 230.501 defines an "accredited investor" as a bank, broker/dealer, investment advisor, private business development company, entity "not formed for the specific purpose of acquiring the securities offered," officer of the issuer, person or couple with over $1 million in net worth, person with annual income over $200,000, trust with assets over $5 million, entity whose members are accredited investors, persons with certain designated professional certifications, "knowledgeable employee," "family office" or "family client." 17 CFR § 230.501.

191.    There is no indication that Shaner Hotel Group verified or had any reasonable basis to believe that the members of R-Hotel qualified as "accredited investors" under 17 CFR § 230.501, as required by Rule 506(b)(1).

192.    As such, the offering of the investment in the Company to Plaintiffs did not qualify for an exemption from federal registration requirements pursuant to Rule 506(b) of Regulation D, and the failure by Defendants Shaner Hotel Group or Investment Manager to register the investment with the Securities and Exchange Commission is fatal to the investment and unlawful.

193.    Finally, if the investment was exempt from federal registration under Rule 506(b), then it must also meet the requirements of Section 230.502.

194.    Section 230.502 sets forth the conditions applicable to sales of investments under Regulation D, in relevant portion as follows:

(b) Information requirements —
    (1) When information must be furnished. **If the issuer sells securities under § 230.506(b) to any purchaser that is not an accredited investor, the issuer shall furnish the information specified in paragraph (b)(2) of this section to such purchaser a reasonable time prior to sale**. The issuer is not required to furnish the specified information to purchasers when it sells securities under § 230.504, or to any accredited investor.

NOTE:  **When an issuer provides information to investors pursuant to paragraph (b)(1), it should consider providing such information to accredited investors as well, in view of the anti-fraud provisions of the federal securities laws**.
    (2) Type of information to be furnished
        (i) If the issuer is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act, at a reasonable time prior to the sale of securities the issuer shall furnish to the purchaser, to the extent material to an understanding of the issuer, its business and the securities being offered:
        (A) Non-financial statement information. If the issuer is eligible to use Regulation A (§ 230.251-263), the same kind of information as would be required in Part II of Form 1-A (§ 239.90 of this chapter). If the issuer is not eligible to use Regulation A, the same kind of information as required in Part I of a registration statement filed under the Securities Act on the form that the issuer would be entitled to use.
        (B) Financial statement information—
            (1)  **Offerings up to $20,000,000. The financial statement information required by paragraph (b) of Part F/S of Form 1– A. Such financial statement information must be prepared in accordance with generally accepted accounting principles in the United States (US GAAP).** . . .
                ***
      (v) The issuer shall also make available to each purchaser at a reasonable time prior to his purchase of securities in a transaction under § 230.506(b) the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the issuer possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of information furnished under paragraph (b)(2) (i) or (ii) of this section. . . .

39

(vii) At a reasonable time prior to the sale of securities to any purchaser that is not an accredited investor in a transaction under § 230.506(b), the issuer shall advise the purchaser of the limitations on resale. . . .

<div align="center">***</div>

(d) **Limitations on resale. Except as provided in § 230.504(b)(1), securities acquired in a transaction under Regulation D shall have the status of securities acquired in a transaction under section 4(a)(2) of the Act and cannot be resold without registration under the Act or an exemption therefrom**.

17 CFR § 230.502 (emphasis supplied).

195.    Shaner Hotel Group failed to supply Plaintiffs with the non-financial information required for sale of securities to unaccredited investors set forth in Section 230.502(b)(2)(i)(A).

196.    Shaner Hotel Group failed to supply Plaintiffs with the GAAP financial statement information required for sale of securities to unaccredited investors set forth in Section 230.502(b)(2)(i)(B).

197.    Plaintiffs were not provided by Shaner Hotel Group with the opportunity to obtain information to verify the accuracy of information furnished by Defendants in the proforma prior to purchase as required by Section 230.502(b)(2)(v).

198.    Plaintiffs were never advised by *any* of the Defendants about the limitations on resale of the investment prior to purchase as required by Section 230.502(b)(2)(vii).

199.    For any and all of these reasons, the offering of the investment in the Company to R-Hotel did not qualify for an exemption from federal registration requirements pursuant to Rule 506(b) of Regulation D, and the failure by Shaner Hotel Group to register the investment with the Securities and Exchange Commission is fatal to the investment.

200.    Alternatively, Defendants based their assertion of registration exemption on Rule 506(c), which states:

Conditions to be met in offerings not subject to limitation on manner of offering—

(1) General conditions. To qualify for exemption under this section, sales must satisfy all the terms and conditions of §§ 230.501 and 230.502(a) and (d).

(2) Specific conditions—

(i) Nature of purchasers. **All purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors**.

(ii) **Verification of accredited investor status**. . .

17 CFR § 230.506(c) (emphasis supplied).

201.    As set forth hereinabove, there is no indication that Shaner Hotel Group verified or had any reasonable basis to believe that the members of R-Hotel qualified as "accredited investors" under Section 230.501, as required by Rule 506(c)(1).

202.    As such, the offering of the investment in the Company to Plaintiffs did not qualify for an exemption from federal registration requirements pursuant to Rule 506(c)(1) of Regulation D, and the failure by Shaner Hotel Group to register the investment with the Securities and Exchange Commission is fatal to the investment.

203.    Furthermore, Shaner Hotel Group never obtained documentation of the income of the members of R-Hotel to verify they were as accredited investors on the basis of income or otherwise, nor was written representation of future income obtained from R-Hotel's members.

204.    Nor did Shaner Hotel Group review bank statements, brokerage statements, statements of securities holdings, certificates of deposit, tax assessments, appraisal reports or a consumer reporting agency report to determine whether R-Hotel's members were accredited investor on the basis of net worth.

205.    As such, the offering of the investment in the Company to Plaintiffs did not qualify for an exemption from federal registration requirements pursuant to Rule 506(c)(2) of Regulation D, and the failure by Shaner Hotel Group to register the investment with the Securities and Exchange Commission is fatal to the investment.

206.    Regulation D is further subject to the following statutory limitations:

§ 230.500 Use of Regulation D.

Users of Regulation D (§§ 230.500 et seq.) should note the following:

(a) Regulation D relates to transactions exempted from the registration requirements of section 5 of the Securities Act of 1933 (the Act) (15 U.S.C.77a et seq., as amended). Such transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws. Issuers are reminded of their obligation to provide such further material information, if any, as may be necessary to make the information required under Regulation D, in light of the circumstances under which it is furnished, not misleading.

(b) Nothing in Regulation D obviates the need to comply with any applicable state law relating to the offer and sale of securities. Regulation D is intended to be a basic element in a uniform system of federal-state limited offering exemptions consistent with the provisions of sections 18 and 19(c) of the Act (15 U.S.C. 77r and 77(s)(c)). **In those states that have adopted Regulation D, or any version of Regulation D, special attention should be directed to the applicable state laws and regulations, including those relating to** registration of persons who receive remuneration in connection with the offer and sale of securities, to disqualification of issuers and other persons associated with offerings based on state administrative orders or judgments, and to **requirements for filings of notices of sales**.

                    ***

(d) Regulation D is available only to the issuer of the securities and not to any affiliate of that issuer or to any other person for resales of the issuer's securities. Regulation D provides an exemption only for the transactions in which the securities are offered or sold by the issuer, not for the securities themselves.

                    ***

(f) In view of the objectives of Regulation D and the policies underlying the Act, Regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with Regulation D, is part of a plan or scheme to evade the registration provisions of the Act. In such cases, registration under the Act is required. . . .

17 CFR § 230.500 (emphasis supplied).

207.    Even if the investment in the Company qualified for an exemption from federal registration requirements under Regulation D – which it very clearly did not – offerors must also satisfy reciprocal "blue sky" filing requirements promulgated by the Pennsylvania Department of Banking and Securities.

208.    Assuming *arguendo* that these Defendants complied with Regulation D, the applicable state regulation exemption rule in this case is 70 P.S. § 1-203(t), which states:

§ 1-203. Exempt transactions

The following transactions are exempted from sections 201[10] and 211[11]: . . .

(t) Any offer and any sale resulting from such offer where the securities being offered, whether in or outside of this State, will be sold only to accredited investors as that term is defined in the rules and regulations of the Securities and Exchange Commission if:

(i) The securities are sold in good faith reliance that the offering would qualify for an exemption from registration under section 5 of the Securities Act of 1933 (15 U.S.C. § 77e), pursuant to section 3(a)(11) of the Securities Act of 1933 (15 U.S.C. § 77c(a)(11)). . . ;

(ii) The issuer files a notice in the form prescribed by rule of the department, together with a copy of any offering document or literature proposed to be used in connection with such offer and sale, with the department not later than the day on which the issuer receives from any person an executed subscription agreement or other contract to purchase the securities being offered or the issuer receives consideration from any person therefor, whichever is earlier; [and]

(iii) The issuer pays the filing fee specified in section 602(b.1)[.]

70 P.S. § 1-203(t).

209.    Section 3(a)(11) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(11), referenced in 70 P.S. § 1-203(t)(i), exempts from registration "[a]ny security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory." 15 U.S.C. § 77c(a)(11).

210.    Upon information and belief, Defendant Shaner Member, which purchased a 50 percent interest in the Company, is a Delaware limited liability company, and therefore the investment does not qualify as "an issue offered and sold only to persons resident within a single State" under Section 3(a)(11) of the Securities Act of 1933. As such, the investment could not have been "sold in good faith reliance that the offering would qualify for an exemption from registration

---

[10] Section 201 provides: "Registration requirement. It is unlawful for any person to offer or sell any security in this State unless the security is registered under this act, the security or transaction is exempted under section 202 or 203 hereof or the security is a federally covered security." 70 P.S. § 1-201.

[11] Section 211 requires notice to be filed with the Pennsylvania Department of Banking and Securities in conjunction with the sale of any "security that is a covered security under section 18(b)(2) of the Securities Act of 1933 (48 Stat. 74, 15 U.S.C. § 77r(b)(2))." 70 P.S. § 1-211.

. . . pursuant to section 3(a)(11) of the Securities Act of 1933," and therefore the investment is not an exempt transaction under 70 P.S. § 1-203(t)(i).

211.    70 P.S. § 1-203(t)(ii) and (iii) also clearly require the investment's issuer to file a notice with the Pennsylvania Department of Banking and Securities and pay the requisite filing fee.

212.    Upon information and belief, Shaner Hotel Group, the Investment Manager and the Company failed to file the required notice of the investment in the Company with the Pennsylvania Department of Banking and Securities pursuant to 70 P.S. § 1-203(t)(ii), and further failed to pay the requisite filing fee pursuant to 70 P.S. § 1-203(t)(iii).

213.    Furthermore, the following acts are unlawful pursuant to 70 P.S. § 1-401.

> Sales and purchases. It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:
> (a) To employ any device, scheme or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

214.    Shaner Hotel group violated the provisions of 70 P.S. § 1-401 when it made knowingly false representations, both orally and in the proforma, regarding the projected and expected occupancy, revenue, cash flow and income for the Hotel in its first five years of operation.

215.    The Shaner Hotel Group was aware of the falsity of the occupancy, revenue, cash flow and income projections in the proforma, as the Shaner Hotel Group owned multiple hotels in the area and was aware of the revenue, cash flow and income data of those hotels in the first five years of operation.

216.    Indeed, the local market is saturated with more than fifteen competitors in the vicinity of the Hotel, rendering high initial cash flow projections especially unlikely to materialize, even in the absence of a pandemic.

217.    The falsity of the occupancy projections in the proforma is belied by the fact that even after the Covid-19 pandemic ended, the Hotel never approached 70 percent occupancy.

218.    Shaner Hotel Group's proforma regarding projected and expected Hotel occupancy, revenue, cash flow and income was materially misleading, as ultimately proven by the Hotel Project's performance, in violation of 70 P.S. § 1-401.

219.    The proforma also violated 70 P.S. § 1-401 as it lacked key and required elements to allow the principals of R-Hotel to properly evaluate the Company's projections and the high risk of an investment in the Company.

### <u>COUNT I: Fraudulent Inducement</u>
*(DJ Risk, Steve Risk, Amy Rineer and Kim Risk v. Shaner Hotel Group)*

220.    Plaintiffs repeat and reallege the forgoing paragraphs as though the same were set forth at length herein.

221.    Fraudulent inducement is a representation made with the intent of misreading another into relying on it (i.e., a knowingly false representation with the intent to defraud or mislead). *Honey Creek Stone Co. v. Telsmith, Inc.,* 11 Pa. D. & C.5th 33, 49 (Lawrence Ct. Com. Pl. 2009)(citing *Eigen v. Textron Lycoming Reciprocating Engine Div.,* 2005 Pa. Super. 141, 874 A.2d 1179, 1185 (Pa. Super. 2005)).

222.    The elements of fraudulent inducement are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury that was proximately caused by the reliance. *Id.*

223.    Fraud must be established with clear and convincing evidence. *Highmont Music Corp. v. J. M. Hoffmann Co.,* 397 Pa. 345, 155 A.2d 363, 366 (Pa. 1959); *Creswell v. Pennsylvania Nat'l Mutual Casualty Ins. Co.,* 2003 Pa. Super 90, 820 A.2d 172, 179 (Pa. Super. 2003).

224.    Shaner Hotel Group made knowingly false representations in the proforma regarding the projected and expected occupancy, revenue, cash flow and income for the Hotel in its first five years of operation.

225.    Those misrepresentations were material insofar as they convinced Plaintiffs that the benefits from an investment in the Company – a $250,000 annual income and the ability to refinance the Hotel in year one and exit the investment by year five – were well worth the $150,000 anticipated annual finance cost of the investment.

226.    The Shaner Hotel Group was aware of the falsity of the occupancy, revenue, cash flow and income projections in the proforma, as the Shaner Hotel Group owned multiple hotels in the area and was aware of the revenue, cash flow and income data of those hotels in the first five years of operation.

227.    Indeed, the local market is saturated with more than fifteen competitors in the vicinity of the Hotel, rendering high initial cash flow projections especially unlikely to materialize, even in the absence of a pandemic.

228.    The falsity of the occupancy projections in the proforma is belied by the fact that even after the Covid-19 pandemic ended, the Hotel never approached 70 percent occupancy.

229.    Shaner Hotel Group's proforma regarding projected and expected Hotel occupancy, revenue, cash flow and income was materially misleading, as ultimately proven by the Hotel Project's performance.

230.    The proforma also lacked key and required elements to allow the principals of R-Hotel to properly evaluate the Company's projections and the high risk of an investment in the Company.

231.    Plaintiffs DJ Risk, Steve Risk, Kim Risk and Amy Rineer justifiably relied on the false material representations of Shaner Hotel Group regarding projected and expected Hotel occupancy, revenue, cash flow and income in the proforma, in their decision to form R-Hotel and invest $1.75 million in the Company.

WHEREFORE Plaintiffs DJ Risk, Steve Risk, Amy Rineer and Kim Risk respectfully request that this Honorable Court enter judgment in their favor and against Defendant Shaner Hotel Group on Count I of this Complaint for fraudulent inducement, award damages to Plaintiffs in an amount to be determined at trial, but not less than $1.75 million, and grant such other relief as the Court deems just and appropriate.

## COUNT II: Breach of Contract (LLC Agreement)
*(R-Hotel v. Investment Manager)*

232.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

233.    "[T]hree elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *McCabe v. Marywood Univ.,* 166 A.3d 1257, 1262 (Pa. Super. 2017)(citing *412 N. Front St. Associates, LP v. Spector Gadon & Rosen, P.C.,* 2016 Pa. Super. 266, 151 A.3d 646, 657 (Pa. Super. 2016); *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.,* 635 Pa. 427, 137 A.3d 1247, 1258 (Pa. 2016)).

234.    R-Hotel, the Shaner Member and the Investment Manager entered into the LLC Agreement, which was executed on September 19, 2018. Ex. 5.

47

235.     Delaware law controls the LLC Agreement. *Id.* Art. 14.3.

236.     The Investment Manager's demand for $1,377,305.50 in Additional Capital Contributions to fund principal paydowns and loan costs violates Article 3.2(a)(ii) of the LLC Agreement.

237.     The Investment Manager's acceptance of $2.8 million from the Shaner Member violates Article 6.4(l) of the LLC Agreement.

238.     The Investment Manager's execution of the Third Amended and Restated Term Note and the Fourth Loan Modification Agreement without the knowledge and consent of R-Hotel violates Art 6.4(d) & (g) of the LLC Agreement.

239.     The Investment Manager obtained refinancing without disclosing the terms of the Third Amended and Restated Term Note, in violation of Article 6.5(b) of the LLC Agreement.

240.     The Investment Manager failed to transmit any Monthly Report in violation of Article 8.4 of the LLC Agreement.

241.     The monthly financial statements intermittently transmitted via email to R-Hotel by the Hotel Manager pursuant to Article 7.4(a) of the Hotel Management Agreement – if purported by Defendants to be "Monthly Reports" under the LLC Agreement – violate Article 13.3 of the LLC Agreement, which requires financial reports to be transmitted by U.S. mail, *not* by email.

WHEREFORE Plaintiff R-Hotel LLC respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Investment Manager on Count II of this Complaint for breach of contract, award damages to R-Hotel in an amount to be determined at trial, but not less than $1.75 million, and grant such other relief as the Court deems just and appropriate.

## COUNT III: Breach of Contract (Hotel Management Agreement)
*(R-Hotel v. Hotel Manager)*

242.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

243.    "[T]hree elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *McCabe v. Marywood Univ.,* 166 A.3d 1257, 1262 (Pa. Super. 2017)(citing *412 N. Front St. Associates, LP v. Spector Gadon & Rosen, P.C.,* 2016 Pa. Super. 266, 151 A.3d 646, 657 (Pa. Super. 2016); *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.,* 635 Pa. 427, 137 A.3d 1247, 1258 (Pa. 2016)).

244.    The Hotel Management Agreement is the exclusive operations and management contract among the Company (by Lance T. Shaner "CEO") and the Hotel Manager (by its "President" whose signature is illegible). *See* Ex. 5.

245.    Pennsylvania law controls the Hotel Management Agreement. *Id.* Art. 28.3.

246.    The Hotel Manager violated Article 2.2 of the Hotel Management Agreement by failing and refusing to provide R-Hotel with any agreement for review, consideration or approval after the completion of construction of the Hotel.

247.    The Hotel Manager violated Article 7.2 of the Hotel Management Agreement by failing to transmit certified Annual Financial Statements to R-Hotel.[12]

248.    The Hotel Manager violated Section 7.4(a) of the Hotel Management Agreement between January 2024 and April 2024, and between July 2024 and March 2025, by failing to transmit monthly financial statements to R-Hotel.

---

[12] R-Hotel did receive certain *monthly* financial statements which included year-to-date results, none of which contained an annual balance sheet, a statement of operations and a statement of changes in financial position, and thus did not qualify as an "Annual Financial Statement" under Article 7.2.

249.    Importantly, the Hotel Manager stopped providing Plaintiff with financial reports after the Investment Manager secretly executed the Third Amended and Restated Term Note and the Fourth Loan Modification Agreement with Pennian Bank, without R-Hotel's knowledge or consent. The financial reports presumably would have reflected the impermissible funding arrangement.

250.    The Hotel Manager violated Article 7.4(b) of the Hotel Management Agreement by failing to *ever* provide an Annual Business Plan for R-Hotel's review and approval.[13]

251.    The Hotel Manager violated Article 11.4 of the Hotel Management Agreement by failing and refusing to provide to R-Hotel the required Annual Statement of Manager's Fee.

252.    The Hotel Manager violated Article 14.2 of the Hotel Management Agreement by failing and refusing to *ever* provide to R-Hotel the required Annual Capital Budget.

253.    The Hotel Manager violated Article 14.5 of the Hotel Management Agreement by failing and refusing to *ever* provide to R-Hotel the required Annual Business Plan.

WHEREFORE Plaintiff R-Hotel LLC respectfully requests that this Honorable Court enter judgment in its favor and against Defendant Hotel Manager on Count III of this Complaint for breach of contract, award damages to Plaintiff in an amount to be determined at trial, but not less than $1.75 million, and grant such other relief as the Court deems just and appropriate.

## COUNT IV: Breach of Fiduciary Duty
### *(R-Hotel v. Investment Manager)*

254.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

---

[13] Although the Hotel Manager's January monthly financial report provided a budget for the upcoming year, this does not constitute an Annual Business Plan under Article 7.4(b).

255.    Section 14.3 of the LLC Agreement states that "[t]his Agreement must be construed in accordance with and governed by the laws of the State of Delaware . . ." Ex. 5 § 14.3.

256.    Delaware courts have determined that "breach of fiduciary duty claims sound in tort[.]" *Jung v. El Tinieblo Int'l, Inc.,* 2022 Del. Ch. LEXIS 313, *15 (Del. Ch. Oct. 31, 2022)(citing *In re Rural Metro Corp.,* 88 A.3d 54, 98 (Del. Ch. 2014) ("A breach of fiduciary duty is an equitable tort."); *Sloan v. Segal,* 2008 Del. Ch. LEXIS 3, 2008 WL 81513, at *9 (Del. Ch. Jan. 3, 2008) (reasoning a breach of fiduciary duty could be viewed "as having committed actions in the nature of a tort"); J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act,* 11 DEL. L. REV. 71 (2010)).

257.    As such, the limited choice of law clause contained in the LLC Agreement does not apply to the analysis of Plaintiff's claim for breach of fiduciary duty.

258.    R-Hotel is domiciled in Pennsylvania, the Investment Manager operates from a Pennsylvania business address, the Hotel at the heart of the dispute is located in Pennsylvania, and R-Hotel's damages accrued in Pennsylvania. Thus, Pennsylvania law applies, because Pennsylvania "has the most significant relationship to the occurrence and the parties." *Melmark, Inc. v. Schutt,* 651 Pa. 714, 732 (2019) (citing *Griffith v. United Air Lines,* 416 Pa. 1, 21, 203 A.2d 796, 805 (1964); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269-70 (3d Cir. 1988); *Ramey v. Wal-Mart, Inc.,* 967 F. Supp. 843, 844 (E.D. Pa. 1997); 6 AM. JUR. 2D Conflict of Laws §§3, 111).

259.    Under Pennsylvania law, "[t]o establish a claim of breach of fiduciary duty, a plaintiff must show: the existence of a fiduciary relationship between the plaintiff and the defendant, that the defendant negligently or intentionally failed to act in good faith and solely for the plaintiff's benefit, and that the plaintiff suffered an injury caused by the defendant's breach of

its fiduciary duty." *Spinelli v. Fallon,* 322 A.3d 956, 964-965 (Pa. Super 2024)(citing *Marion v. Bryn Mawr Trust Co.,* 288 A.3d 76, 88 (Pa. 2023)).[14]

260.    15 Pa.C.S. § 8849.2 sets out the standards of conduct for managers of limited liability companies, as follows:

(a) General rule.— A manager of a manager-managed limited liability company owes to the company and, subject to section 8881(b) (relating to direct action by member), the members the duties of loyalty and care stated under subsections (b) and (c).

(b) Duty of loyalty.— The fiduciary duty of loyalty of a manager in a manager-managed limited liability company includes the duties:

(1) to account to the company and to hold as trustee for it any property, profit or benefit derived by the manager:

(i) in the conduct or winding up of the company's activities and affairs;

(ii) from a use by the manager of the company's property; or

(iii) from the appropriation of a company opportunity;

(2) to refrain from dealing with the company in the conduct or winding up of the company's activities and affairs as or on behalf of a person having an interest adverse to the company; and

(3) to refrain from competing with the company in the conduct of the company's activities and affairs until completion of the winding up of the company.

(c) Duty of care.— The duty of care of a manager of a manager-managed limited liability company in the conduct or winding up of the company's activities and affairs is to refrain from engaging in gross negligence, recklessness, willful misconduct or knowing violation of law.

(d) Good faith and fair dealing.— A manager of a manager-managed limited liability company shall discharge the duties and obligations under this title or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing.

15 Pa.C.S. § 8849.2.

261.    15 Pa.C.S. § 8881(a) provides that "a member may maintain a direct action against another member, a manager or the limited liability company to enforce the member's rights and

---

[14] Alternatively, under Delaware law, "[t]he equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of the duty." *Crispo v. Musk,* 2022 Del. Ch. LEXIS 291, *27 (Del. Ch. Oct. 11, 2022)(citing and quoting *8585Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC,* 2018 Del. Ch. LEXIS 222, 2018 WL 3326693, *23 (Del. Ch. July 6, 2018)). Under Delaware law, a Plaintiff can establish "control sufficient to give rise to fiduciary status" by "alleg[ing] facts that support a reasonable inference that the defendants in fact exercised control over the business and affairs of the corporation." *8585Basho Techs. Holdco B,* 2022 Del. Ch. LEXIS 291, *28. In this case, the Investment Manager's breach of duties owed to Plaintiff has caused Plaintiff alone to suffer harm, and any recovery would solely benefit Plaintiff.

protect the member's interests, including rights and interests under the operating agreement or this title or arising independently of the membership relationship."

262.    In order to maintain a direct action against a limited liability company under Pennsylvania law, the member "must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." 15 Pa.C.S. § 8881(b).

263.    The Investment Manager owes a duty of care to R-Hotel under 15 Pa.C.S. § 8849.2(c), and breached this duty by failing to act in good faith and for R-Hotel's benefit when the Investment Manager:

      a.  deliberately withheld from R-Hotel information concerning the Company's need for additional capital required to execute the Third Amended and Restated Promissory Note and Fourth Loan Modification Agreement with Pennian Bank;

      b.  deliberately withheld from R-Hotel the content of the Third Amended and Restated Promissory Note and Fourth Loan Modification Agreement;

      c.  solicited R-Hotel's consent to the Fourth Loan Modification Agreement without fully disclosing the terms of the extension; and

      d.  improperly accepted funding from Lance Shaner, by and through the Shaner Member, in violation of the LLC Agreement.

264.    The Investment Manager's election to unilaterally enter into the Fourth Loan Modification Agreement and Third Amended and Restated Promissory Note, knowing the Hotel was not producing the additional $250,000 quarterly principal payment required by Pennian Bank, was grossly negligent and/or reckless, and therefore violated its duty of care.

265.    The Investment Manager's further allowance of Lance Shaner's guaranty of the Company's debt to Pennian Bank under the Fourth Loan Modification Agreement, knowing the Hotel was not producing the sufficient income to service the terms of the debt, was grossly negligent and/or reckless, and therefore violated its duty of care.

266.    The Investment Manager's acceptance of $2.8 million from Lance Shaner, by and through the Shaner Member, in violation of the LLC Agreement, knowing the Hotel would not produce income to repay this sum, was grossly negligent and/or reckless, and therefore violated its duty of care.

267.    R-Hotel was injured by the Investment Manager's breach of its fiduciary duty.

268.    R-Hotel would not have agreed to the terms of the Fourth Loan Modification Agreement and Third Amended and Restated Promissory Note, and would not have agreed to accept $2.8 million from Lance Shaner, by and through the Shaner Member, in order to satisfy the quarterly principal paydown requirements contained therein.

269.    As a result, R-Hotel has been damaged insofar as it has lost its original $1.75 million investment in the Company, and the Investment Manager is demanding an additional payment from R-Hotel of $1,377,305.50.

WHEREFORE Plaintiff R-Hotel LLC respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Investment Manager on Count IV of this Complaint for breach of fiduciary duty, award damages to Plaintiff in an amount to be determined at trial, but not less than $3,127,305.50, and grant such other relief as the Court deems just and appropriate.

### COUNT V: Aiding and Abetting Breach of Fiduciary Duty
*(Plaintiff v. Lance Shaner, Shaner Member and Hotel Manager)*

270.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

271.    "Aiding and abetting breach of a fiduciary duty, pursuant to section 876 of the Restatement (Second) of Torts, 'is a viable cause of action in Pennsylvania.'" *Spinelli v. Fallon,* 322 A.3d 956, 965 (Pa. Super 2024)(citing *Marion v. Bryn Mawr Trust Co.,* 288 A.3d 76, 85 (Pa. 2023)).

272.    Section 876 provides:

Persons Acting in Concert. For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
  (a) does a tortious act in concert with the other or pursuant to a common design with him, or
  (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
  (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Spinelli*, 322 A.3d at 965 (Restatement 2d of Torts, § 876(a)-(c)).

273.    In this case, Defendants Lance Shaner, the Shaner Member and the Hotel Manager aided and abetted the Investment Manager's breach of the fiduciary duty it owes to R-Hotel pursuant to 15 Pa.C.S. § 8849.2(c)

274.    The Investment Manager's election to unilaterally enter into the Fourth Loan Modification Agreement and Third Amended and Restated Promissory Note, knowing the Hotel was not producing the additional $250,000 quarterly principal payment required by Pennian Bank, was grossly negligent and/or reckless, and therefore violated its duty of care.

275.    The Investment Manager's further allowance of Lance Shaner's guaranty of the Company's debt to Pennian Bank under the Fourth Loan Modification Agreement, knowing the Hotel was not producing the sufficient income to service the terms of the debt, was grossly negligent and/or reckless, and therefore violated its duty of care.

276.    The Investment Manager's acceptance of $2.8 million from Lance Shaner, by and through the Shaner Member, in violation of the LLC Agreement, knowing the Hotel would not produce income to repay this sum, was grossly negligent and/or reckless, and therefore violated its duty of care.

277.    The Hotel Manager aided and abetted the Investment Manager's efforts to deliberately withhold information from R-Hotel concerning the Company's need for additional capital by failing to transmit required monthly financial statements to R-Hotel which would have revealed that the Investment Manager (1) secretly executed the Third Amended and Restated Term Note without R-Hotel's knowledge or consent, (2) secretly executed the Fourth Loan Modification Agreement without R-Hotel's knowledge or consent, and (3) secretly accepted $2.8 million in funding from Lance Shaner, by and through the Shaner Member, without R-Hotel's knowledge or consent

278.    The Hotel Manager further aided and abetted the Investment Manager's efforts to deliberately withhold information from R-Hotel concerning the Company's need for additional capital by failing to transmit certified Annual Financial Statements, Annual Business Plans and Annual Capital Budgets to R-Hotel.

279.    Lance Shaner executed a secret personal guaranty with Pennian Bank in support of the undisclosed Fourth Loan Modification Agreement, and aided and abetted the Investment Manager's breach of its fiduciary duty to R-Hotel by surreptitiously causing the Shaner Member to transfer $2.8 million to the Company which would prevent the Company from defaulting on the undisclosed Fourth Loan Modification Agreement and triggering Lance Shaner's personal guaranty thereof.

280.    The Shaner Member aided and abetted the Investment Manager's breach of its fiduciary duty to R-Hotel by surreptitiously transferring $2.8 million to the Company in order to prevent the Company from defaulting on the undisclosed Fourth Loan Modification Agreement and triggering Lance Shaner's personal guaranty thereof.

281.    As a result, R-Hotel has been damaged insofar as it has lost its original $1.75 million investment in the Company, and the Investment Manager is demanding an additional payment from R-Hotel of $1,377,305.50.

WHEREFORE Plaintiff R-Hotel LLC respectfully requests that this Honorable Court enter judgment in their favor and against Defendants Lance Shaner, the Shaner Member and the Hotel Manager on Count V of this Complaint for aiding and abetting breach of fiduciary duty, award damages to Plaintiff in an amount to be determined at trial, but not less than $3,127,305.50, and grant such other relief as the Court deems just and appropriate.

## COUNT VI: Violation of 70 P.S. §§ 1-203(t), 1-401
### *(Plaintiffs v. Shaner Hotel Group)*

282.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

283.    70 P.S. § 1-203(t) applies to R-Hotel's investment in the Company.

284.    R-Hotel's investment in the Company is not an exempt transaction under 70 P.S. § 1-203(t)(i).

285.    Shaner Hotel Group violated 70 P.S. § 1-203(t)(ii) and (iii) by failing to file the required notice with the Pennsylvania Department of Banking and Securities and pay the requisite filing fee.

286.     Shaner Hotel Group violated 70 P.S. § 1-401 when it made knowingly false representations, both orally and in the proforma, regarding the projected and expected occupancy, revenue, cash flow and income for the Hotel in its first five years of operation.

287.     Shaner Hotel Group's proforma regarding projected and expected Hotel occupancy, revenue, cash flow and income was materially misleading, as ultimately proven by the Hotel Project's performance, in violation of 70 P.S. § 1-401.

288.     The proforma also violated 70 P.S. § 1-401 as it lacked key and required elements to allow the principals of R-Hotel to properly evaluate the Company's projections and the high risk of an investment in the Company.

289.     Plaintiffs were not sophisticated hotel owners or managers, and relied to their detriment on the fraudulent misrepresentations of Shaner Hotel Group in the advertisement and sale of the investment in the Hotel Project through the purchase of a 50 percent interest Company.

290.     Plaintiffs have been damaged as a result.

291.     70 P.S. § 1-501(b) provides Plaintiffs with a private right of action against Shaner Hotel Group, to wit:

> Any person who purchases a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, shall be liable to the person selling the security to him, who may sue either at law or in equity to recover the security, plus any income or distributions, in cash or in kind, received by the purchaser thereon, upon tender of the consideration received, or for damages if the purchaser no longer owns the security. . .

292.     Plaintiffs are thus entitled to the cost of their investment and the unpaid distributions promised by Shaner Hotel Group.

WHEREFORE Plaintiffs Kim Risk, DJ Risk, Steve Risk, Amy Rineer and R-Hotel LLC respectfully request that this Honorable Court enter judgment in their favor and against Defendant

Shaner Hotel Group on Count VI of this Complaint for violation of 70 P.S. §§ 1-203(s), 1-401, award damages to Plaintiffs in an amount to be determined at trial, but not less than $3 million, and grant such other relief as the Court deems just and appropriate.

### COUNT VII: Violation of 15 U.S.C. §§ 77e, 77l(a)
*(Plaintiffs v. Shaner Hotel Group and Lance Shaner)*

293.    Plaintiff repeats and realleges the forgoing paragraphs as though the same were set forth at length herein.

294.    The Securities Act sets forth the following prohibitions with respect to interstate commerce and the mails:

§ 77e. Prohibitions relating to interstate commerce and the mails
(a) Sale or delivery after sale of unregistered securities.  Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
   (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
   (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
(b) Necessity of prospectus meeting requirements of § 10 of this Act.  It shall be unlawful for any person, directly or indirectly—
   (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this title [15 USCS §§ 77a *et seq.*], unless such prospectus meets the requirements of section 10 [15 USCS § 77j]; or
   (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 10 [15 USCS § 77j(a)].
(c) Necessity of filing registration statement.  It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8 [15 USCS § 77h].

15 .S.C. § 77e (brackets in original).

295.    The Securities Act of 1933 requires securities sellers to provide full, fair, and accurate disclosure of financial and other material information when offering new securities for sale, in order to prevent fraud and allow investors to make informed decisions.

296.    15 U.S.C. § 77l(a) is entitled "Civil liabilities arising in connection with prospectuses and communications," and it provides in relevant portion:

> In general. Any person who-
> (1) offers or sells a security in violation of section 77e of this title, or
> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
> shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

297.    Section 77l(a)(2) of the 33 Act applies to R-Hotel's investment in the Company.

298.    While the investment may be exempted from the 33 Act's SEC registration requirement because it is a small offering, it is not subject to exemption under Section 77c(a)(2) or 77c(a)(14) of the 33 Act.

299.    Shaner Hotel Group made use of communications in interstate commerce in order to sell an unregistered security, in violation of Section 77e(a)(1) of the Securities Act.

300.    The Investment Manager caused the LLC Agreement – effectuating the sale of the unregistered security at issue in this case – to be transported by an instrumentation of interstate commerce in violation of Section 77e(a)(2) of the Securities Act.

301.    The Shaner Hotel Group violated Section 77e(b)(2) of the Securities Act by causing a prospectus that failed to meet the requirements of 15 USCS § 77j(a) to be carried in interstate commerce for the purpose of sale.

302.    The Shaner Hotel Group violated Section 77e(c) of the Securities Act by making use of interstate transportation and communication to offer and sell –via prospectus – an unregistered security.

303.    The Shaner Hotel Group is liable to Plaintiffs pursuant to Section 77l(a)(2) of the 33 Act insofar as Shaner Hotel Group offered for sale through transportation and communication in interstate commerce by means of a prospectus that knowingly included an untrue statement of a material fact and omitted necessary material facts.

304.    Under federal statute, those who control malfeasant actors have joint and several liability for those acts:

> Controlling persons.  Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 [15 USCS § 77k or 77l], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a) (brackets in original).

305.    Shaner Hotel Group is controlled by Defendant Lance Shaner, insofar as the Governor of Shaner Hotel Group is non-party Shaner Operating Corp, and the President of Shaner Operating Corp. is Lance Shaner.

306.    Therefore, Lance Shaner is jointly liable with Shaner Hotel Group for violation of Section 77e(a)(1) of the Securities Act, Section 77e(b)(2) of the Securities Act, 77e(c) of the Securities Act and Section 77l(a)(2) of the 33 Act.

307.    The Investment Manager is controlled by its Governor, Defendant Lance T. Shaner. Furthermore, its sole Member is Shaner Trust, whose sole Trustee is Lance Shaner.

308.    Therefore, Lance Shaner is jointly liable with the Investment Manager for violation of Section 77e(a)(2) of the Securities Act.

WHEREFORE Plaintiffs Kim Risk, DJ Risk, Steve Risk, Amy Rineer and R-Hotel LLC respectfully request that this Honorable Court enter judgment in their favor and against Defendants Shaner Hotel Group and Lance Shaner on Count VII of this Complaint for violation of 15 U.S.C. §§ 77e, 77l(a), award damages to Plaintiffs in an amount to be determined at trial, but not less than $1.75 million, and grant such other relief as the Court deems just and appropriate.

<div style="margin-left:50%">

**SILVERANG, ROSENZWEIG & HALTZMAN, LLC**

</div>

Dated:  January 13, 2026

<div style="margin-left:50%">

By: /s/ Philip S. Rosenzweig
Philip S. Rosenzweig, Esquire
Kevin D. McGowan, Jr., Esquire
Attorney ID Nos. 62461 / 324196
Woodlands Center
900 E. Eighth Avenue, Suite 300
King of Prussia, PA 19406
(phone) 610-263-0115
*Attorneys for Plaintiffs R-Hotel LLC, Donald J. Risk, Amy T. Rineer, Kimbell Risk and Steven Risk*

</div>

4906-6663-8727, v. 2